AARON M. KINIKINI (Bar No. 10225)
LAURA HENRIE (Bar No. 12449)
Disability Law Center
205 North 400 West
Salt Lake City, Utah   84103
Phone:  (801) 363-1347
Fax:  (801) 363-1437
Email:  akinikini@disabilitylawcenter.org
           lhenrie@disabilitylawcenter.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ADAM KELLER, as legal guardian of C.K., a minor child;<br><br>　　　Plaintiff,<br><br>v.<br><br>ALPINE SCHOOL DISTRICT; Alpine School District Board of Education; Samuel Y. Jarman, in his official capacity as Superintendent of Alpine School District; Ryan Burke, in his official capacity as Special Education Director of Alpine School District; Tarra Anderson, in her official and individual capacity; Jane Does 1–5, in their official and individual capacities; and the UTAH STATE BOARD OF EDUCATION; Sydnee Dickson, in her official capacity as the State of Utah Superintendent of Public Instruction,<br><br>　　　Defendants. | **COMPLAINT**<br><br>(Jury Demand)<br><br>Civil No. 2:19-cv-00874-DBP<br><br>Judge_____<br><br>Magistrate Judge: <u>Dustin B. Pead</u> |

## INTRODUCTION

This is a civil rights action brought on behalf of C.K., a vulnerable child with multiple,

significant disabilities, who was subjected to cruel and unconscionable abuse and neglect at the

hands of public school staff  tasked not only with providing appropriate educational services, but
at a minimum, ensuring K.W.'s  physical safety and fundamental human rights.  Plaintiff seeks
damages and equitable relief from the unlawful policies, practices, actions and/or inactions of
defendant ALPINE SCHOOL DISTRICT, as controlled by defendant ALPINE SCHOOL
DISTRICT BOARD OF EDUCATION, enforced and implemented by defendants SAMUEL Y.
JARMAN and RYAN BURKE, and for the actions taken under such policies and practices, and
during the scope of their employment, by defendants TARRA ANDERSON and JANE DOES 1–
5. These actions and policies have been sanctioned and condoned by defendant UTAH STATE
BOARD OF EDUCATION ("USBE") as the ultimate authority over the policies, training, and
operation of public schools within the state of Utah. Such actions and/or inactions by USBE
resulted in the continuous and prolonged abuse and neglect of C.K over a period of several
months and included the deprivation of food and water, unlawful restraint and seclusion,
improper use of special needs equipment, and physical abuse.

Therefore, Plaintiff, C.K., through his legal guardian, ADAM KELLER, by and through
counsel, Disability Law Center, complains, states, alleges, and claims as causes of action against
defendants as follows:

## NATURE OF THE CLAIMS

This 42 U.S.C. § 1983 action seeks damages and equitable relief from the unlawful
policies, practices, actions and/or inactions of defendant ALPINE SCHOOL DISTRICT, as
controlled by defendant ALPINE SCHOOL DISTRICT BOARD OF EDUCATION, enforced
and implemented by defendants SAMUEL Y. JARMAN and RYAN BURKE, and actions taken
pursuant to such policies and practices, and within the scope and course of their employment by

individual defendants TARRA ANDERSON and JANE DOES 1–5 (all the foregoing Alpine

School District personnel and entities are collectively and hereinafter, "the ASD defendants").

The actions and policies of the ASD defendants have been tacitly approved of, condoned, or

permitted to persist without correction, by the actions and/or inactions of defendant UTAH

STATE BOARD OF EDUCATION ("USBE"), as the ultimate authority charged with

promulgating, monitoring, and enforcing the policies, training, and operation of public schools

within the state of Utah, and the ultimate state authority responsible for ensuring that all public

school activities, programs, and facilities are in compliance with state, federal, and constitutional

law.

Plaintiff seeks declaratory judgment, permanent injunctive relief, and damages as well as

legal and equitable relief from defendants' policies and actions that have violated and continue to

violate plaintiff's rights pursuant to Title II of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. § 12131 *et seq.* (2002), and Section 504 of the Rehabilitation Act ("Rehab

Act"), 29 U.S.C. § 794 *et seq* (2011). Plaintiff also brings claims under the United States

Constitution, for violations of his right to be free from forcible and unreasonable seizure of his

person as guaranteed by the Fourth Amendment, and for violations of his right to Equal Protection

of the laws, both of which have been secured against the states by the Fourteenth Amendment to

the U.S. Constitution.

Plaintiff seeks injunctive relief requiring defendants to correct their violations of plaintiff's

rights, prohibiting defendants from continuing their misconduct in violation of the ADA and Rehab

Act, and from engaging in similar conduct in the future.

Plaintiff seeks attorney's fees and court costs pursuant to 42 U.S.C. § 12205 (2010) and 29

U.S.C. § 794(a), and under 42 U.S.C. § 1983 and § 1988.

## PARTIES

1.  Plaintiff C.K. is and was at all times alleged herein a citizen and resident of the State of

    Utah. C.K. is a qualified person with a disability as defined by the ADA and the Rehab

    Act. C.K. is a minor, limiting his ability to protect his legal interests.  His father and legal

    guardian, ADAM KELLER ("Mr. Keller"), must, therefore, represent his interests.

2.  Defendant ALPINE SCHOOL DISTRICT ("ASD") is a public school district providing

    educational services to children in the State of Utah.  It is a public entity subject to Title II

    of the ADA and a recipient of federal funds subject to the Rehab Act, and a "person" within

    the meaning of 42 U.S.C. § 1983. ("§ 1983"). ASD is sued for both legal and equitable

    relief.

3.  Defendant UTAH STATE BOARD OF EDUCATION ("USBE") is the ultimate authority

    over public education within the state of Utah as required by Article X, Section 3 of the

    Utah Constitution. USBE is and was at all times material hereto charged with the oversight,

    supervision, implementation, management, and enforcement of all matters relating to the

    public schools within the State of Utah. USBE is a public entity subject to the ADA and

    recipient of federal funds subject to the Rehab Act and is a "person" as defined under §

    1983. Defendant USBE, is sued for equitable relief by and through the Utah Superintendent

    of Public Instruction, defendant SYDNEE DICKSON, who is sued in her official capacity

    for equitable relief only.

4.  Defendant ALPINE SCHOOL DISTRICT BOARD OF EDUCATION ("Alpine School

    Board") leads and directs the actions, policies, and practices of ASD and consists of seven

elected members. The Alpine School Board is and was at all times material hereto charged with the supervision, control, and management of all matters relating to the public schools within ASD boundaries. Alpine School Board is a public entity subject to the ADA and a recipient of federal funds subject to the Rehab Act. Alpine School Board is a "body corporate" as defined by Utah statute, and may sue and be sued. U.C.A. § 53G-4-401(4). The Alpine School Board is a "person" as defined § 1983 and is sued for equitable relief only.

5.      Defendant SAMUEL Y. JARMAN ("Mr. Jarman"), is the Superintendent of ASD, and as such is responsible for the administration of all educational services within ASD, as well as for the supervision and adequate training of all Associate Superintendents, administrators, principals, teachers, nurses, paraeducators, paraprofessionals, teachers' aides, and other ASD personnel. Mr. Jarman is sued in his official capacity for equitable relief only.

6.      Defendant RYAN BURKE ("Mr. Burke") is the Special Education Director of ASD. Mr. Burke is being sued in his official capacity for equitable relief only as the person who directly oversaw the implementation or failed implementation of policies complained of herein, and for the systemic failure to provide adequate training to the ASD personnel whose actions and/or inactions resulted in the unlawful conduct herein alleged.

7.      Defendant TARRA ANDERSON ("Ms. Anderson") was, at all relevant times, the special education teacher to which C.K. was assigned. Ms. Anderson is being sued in her official and individual capacities as the person directly responsible for allowing and participating in the abuse and neglect of C.K. and the violation of his civil rights under color of law, as

well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement.  She is being sued for legal and equitable relief.

8.   Defendant JANE DOE 1 ("Jane Doe 1") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 1 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

9.   Defendant JANE DOE 2 ("Jane Doe 2") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 2 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

10.   Defendant JANE DOE 3 ("Jane Doe 3") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 3 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

11. Defendant JANE DOE 4 ("Jane Doe 4") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 4 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

12. Defendant JANE DOE 5 ("Jane Doe 5") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 5 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

13. At all relevant times, all defendants were, are, and will be acting under color of state law, custom, and usage, and were and are state actors.

## JURISDICTION AND VENUE

14. This Court has jurisdiction to hear and decide Plaintiff's ADA and Rehab Act claims pursuant to 42 U.S.C. §12188 (2015),§ 12189 (2008), and 29 U.S.C. § 794(a), as the Plaintiff's claims arise under and are based upon violations of Title II of the ADA, 42 U.S.C. §12182, *et seq.* (2010) and Rehab Act, 29 U.S.C. § 794 *et seq.*

15. This Court is vested with original jurisdiction of these claims pursuant to 28 U.S.C. §1331 (2011) and §2201 (2015).

16.   This Court has jurisdiction to hear and decide Plaintiff's claims under the U.S. Constitution pursuant to 28 U.S.C. §1331 (2011).

17.   This court has jurisdiction to grant declaratory relief in this action pursuant to 28 U.S.C. § 2201 (2015).

18.   Venue for this action is proper in the United States District Court for the District of Utah, Central Division pursuant to 28 U.S.C. §§ 125 and §1391(b)-(c) (2015) because all conduct complained of herein occurred or will occur in Utah County, Utah, and the Central Division of this Court. The subject public entities and services immediately at issue are located in Utah County, Utah. The defendants to this action reside in and/or have official duties in the Central Division of the District of Utah.

## FACTUAL BACKGROUND

19.   C.K. is a 10-year-old individual with multiple disabilities, as defined by the ADA and the Rehab Act.

20.   C.K. is nonverbal and has a diagnosis of Epilepsy, Cortical Dysplasia, Lobectomy (removal of left Temporal, Occipital, and part of Parietal Lobes), Anxiety, and Autism. He had his lobectomy surgery in 2011 when he was three (3) years old.

21.   C.K. at all relevant times attended Dan Peterson School ("Dan Peterson"), which is part of ASD. He is, in every way, a qualified person with a disability and can successfully attend any public school controlled by ASD, provided that reasonable and appropriate accommodations to his disabilities are consistently provided as required under the ADA and Rehab Act.

22.    On information and belief, Dan Peterson is a special purpose school where students with moderate to severe special needs are sent within ASD. It is an intentionally segregated environment where students with certain disabilities are categorically assigned based solely on the fact that they have those disabilities.

23.    C.K. transferred to Dan Peterson from Foothill Elementary in August of 2016 and remained there until June of 2018 when he transferred back to Foothill Elementary.

24.    While at Dan Peterson, C.K. was placed in the classroom of Ms. Anderson, who was assisted by five different classroom aides, paraprofessionals, or paraeducators during the relevant period.

25.    Almost immediately after C.K. began attending Dan Peterson, Mr. and Mrs. Keller ("the Kellers") noticed a marked increase in C.K.'s aggression at home including self-injurious behavior.

26.    C.K. at all relevant times had a Student Health Care Plan that had been created and formally adopted by ASD defendants.

27.    On information and belief, a Student Health Care Plan is a document created to memorialize and ensure the appropriate treatment of unique medical, emotional, or behavioral needs of a student for whom such is deemed medically appropriate.

28.    C.K.'s Student Health Care Plan contained specific information regarding C.K.'s diagnoses and disabilities, his physical, mental and emotional limitations, detailed descriptions of his unique behavioral tendencies, and importantly, it provided information regarding his diet and medical needs.

29. The information included in the Student Health Care Plan included specific diet and medication information such as: C.K. is on a specialized diet due to seizures (sliced apples are suggested as a motivator), C.K. has been prescribed on Risperdal (for behaviors), Zonisamide (for seizures), and Versed (for rescue), C.K. needs water frequently to avoid dehydration due to his medications, and C.K. has a difficult time regulating his temperature also as a result of his medication.

30. The Health Care Plan was created by ASD for the guidance of ASD staff and for the benefit and protection of C.K. The plan was signed by Ms. Anderson and the school nurse indicating that they read and agreed with the plan as written for C.K.

31. In March 2017, the Kellers started to receive notes in C.K.'s "Communication Folder," informing them that Ms. Anderson or Jane Does 1-5 were withholding snacks from C.K. because of his behavior.

32. The Kellers contacted C.K.'s medical provider who wrote a letter to the school requesting that the staff not withhold food from C.K.

33. In the letter, C.K.'s medical provider explained that C.K. was on medication that tended to increase his hunger. She explicitly requested that the individuals working with C.K. not restrict his food and advised that, as a result of the medication, he may need more frequent snacks.

34. Mrs. Keller subsequently provided this letter to the staff at Dan Peterson.

35. In a meeting held shortly thereafter, Mrs. Keller requested that Ms. Anderson or Jane Does 1-5 provide C.K. with a healthy snack rather than withholding food if he had negative behavior.

36.    The staff at Dan Peterson reluctantly agreed that they would no longer restrict C.K.'s food.

37.    Following the meeting and up until the time that he transferred from Dan Peterson, C.K. consistently came home from school noticeably famished and dehydrated.

38.    On information and belief, Ms. Anderson or Jane Does 1-5 continued to punitively withhold food and water from C.K. as a result of his behavior.

39.    Although the Kellers provided ASD with a letter from C.K.'s APRN, and though ASD created and was aware of C.K.'s Student Health Care Plan, ASD chose not to follow these crucial instructions, effectively denying Parents' requests for reasonable accommodation, and failing to comply with its own internally created Student Health Care Plan.

40.    On information and belief, ASD failed to train Ms. Anderson or Jane Does 1-5 on C.K.'s Student Health Care Plan or accommodation request from his medical practitioner. Such failures to train, supervise, and otherwise prevent the actions and inactions of Ms. Anderson and Jane Does 1-5 by ASD demonstrates a pervasive deliberate indifference and disregard for duties and obligations of which they were fully aware. Such actions and failures to act had the proximate and foreseeable results complained of herein.

41.    As a direct and proximate result of the ASD defendants' violation of C.K.'s rights under the ADA, the Rehab Act, and the U.S. Constitution, as described herein, C.K. has suffered and continues to suffer injuries, damages, and losses, including, but not limited to: emotional distress, fear, anxiety, and trauma; lost and diminished learning capacity; and expenses for past and future medical care, psychological care, and occupational and behavioral therapies.

42.     On information and belief, defendant Utah State Board of Education ("USBE") has the duty to promulgate rules regarding school districts' provision of education services to students, including those students with disabilities. USBE also has a duty to monitor school districts' compliance with such rules and regulations and also to monitor and enforce such compliance.

43.     On information and belief, USBE fails to fulfill its duties to monitor, enforce, and correct the unlawful practices of school districts such as ASD, as described herein.

44.     On information and belief, USBE fails to ensure that students with disabilities, including plaintiff C.K. receive equal access, comparable benefits, and are otherwise free from discrimination in Utah's public schools as required by the ADA and Rehab Act.

45.     As a proximate and foreseeable result of USBE's failings as described herein, school districts state-wide, including ASD in this instance, consistently and without accountability or consequence, violate their duties under the ADA and Rehab Act, and place students such as C.K. at risk of physical harm due to ineffective and completely inadequate training, insufficient guidance, no meaningful State oversight, and a lack of practical and available enforcement mechanisms, all of which contribute to a system-wide failure by USBE to deter unlawful actions by school districts such as ASD, which cause harm to children such as C.K., as described herein.

46.     On information and belief, special education staff within ASD are not required to obtain any form of training related to restraint and seclusion and individualized needs of special education children prior to obtaining or retaining employment. *See e.g.*, Utah Admin. Code § 277-504-6 (through September 1, 2019) (licensure standards for special education

teachers which have no reference to restraint and seclusion considerations or training for the individualized needs of special education children).

47.     In September 2017, the Kellers started to receive notes in C.K.'s "Communication Folder," informing them that C.K. had been restrained in a "Rifton chair" and removed from the classroom as a punishment for his behavior.

48.     On information and belief, a Rifton Chair is a mechanical aid intended to help children who need support in developing the ability to sit upright and maintain posture, and is intended for appropriate, prescribed use by a qualified medical provider or physical therapist. C.K. has no medical need for the support of a Rifton chair.

49.     A Rifton Chair is universally rejected as a behavior modification tool, or a valid punitive restraint tool. [1] Its improper use as a punitive restrain has resulted in deaths, serious injury, and has been the subject of frequent litigation.[2]

50.     One note indicated that Ms. Anderson or Jane Does 1-5 put C.K. in his Rifton chair out in the hallway for rest time because he was screaming.

---

[1] Guidance from the manufacturer of the Rifton Chair in its user manual contains the following::
*"A Warning Against Restraints: Using straps, trays or supports to restrict a child's movement is considered behavioral restraint, which may raise ethical and legal issues for your facility. Rifton Equipment is not intended for this use.  See* https://cdn.rifton.com/-/media/files/rifton/product-brochures-and-additional-info/straps-supports-poster-english.pdf?la=en (last visited November 7, 2019)

[2] A study and report on the use of restraint and seclusion in public schools by the U.S. Government Accountability Office (GAO) in 2009 involved the examination of selected closed school injury and death cases, including police and autopsy reports and school policies on restraint or seclusion related to these cases. In the resulting GAO report, *Examining the Abusive and Deadly Use of Seclusion and Restraint in Schools* (issued May 19, 2009), the GAO identified several hundred cases of alleged abuse, including deaths that were related to the use of restraint or seclusion of children in public and private schools. The GAO specifically noted that problems with untrained or poorly trained staff were often related to many instances of alleged abuse.
*See* https://www2.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf (last visited November 7, 2019)

51.     A few days later, the Kellers received another note stating C.K. had to sit in the hallway
        again, this time with no chair, beanbag, or blanket during rest time.

52.     The Kellers were unsettled by the use of the Rifton chair and C.K's exclusion from the
        classroom and brought their concerns to Dan Peterson staff during a meeting.

53.     At the meeting, the Kellers requested that staff stop using the Rifton chair and suggested
        alternatives to the restraint and exclusion of C.K. from the classroom and peers. This
        request for reasonable accommodation was rejected by ASD staff.

54.     In the meeting, the Kellers asked about the purpose of the Rifton chair, and staff insisted
        that it was not being used as a disciplinary tool.  The staff explained that it was used
        infrequently and only if C.K. got into it on his own. They also stated that he could get in
        and out of it whenever he wanted.

55.     When the Kellers asked explicitly whether C.K. was buckled into the Rifton chair by Ms.
        Anderson or Jane Does 1-5, they were told "no." The staff asserted that if C.K. were to be
        buckled in the Rifton chair, it was because he did it himself.

56.     The Kellers do not believe that C.K. has the ability to buckle himself into the Rifton chair.

57.     In January 2018, Mrs. Keller's sister spent one day as a substitute in C.K.'s classroom,
        where she noted that C.K. was buckled into the Rifton chair for most of the day.

58.     She also witnessed an aide spend fifteen minutes forcing C.K.'s feet into high top shoes
        that were too small, causing him distress and discomfort.

59.     During lunch, she observed one of the aides, paraprofessionals, or paraeducators cut up a
        protein bar and sandwich with ketchup and shove them into C.K.'s mouth in a single bite,

causing him to gag. The aide, paraprofessional, or paraeducator then forcibly held her hand under his jaw to prevent him from spitting it out.

60.     She also overheard Jane Does 1-5 discussing whether to withhold a snack from C.K. due to his behavior despite the letter from his medical provider, the concern expressed by the Kellers, and the prior agreement of staff not to restrict C.K.'s food for medical reasons.

61.     From January through March 2018, the Kellers continued to receive notes from Dan Peterson, indicating that Ms. Anderson or Jane Does 1-5 were using the Rifton chair as a response to C.K.'s behavior (e.g., hitting, kicking, screaming, and pinching).

62.     Records obtained from Dan Peterson also indicate that C.K. was routinely put in the Rifton chair by Ms. Anderson or Jane Does 1-5 and other related service providers.

63.     In March and April of 2018, C.K. started to receive one-on-one Applied Behavior Analysis ("ABA") treatment at Dan Peterson in Ms. Anderson's classroom through Utah Behavior Services ("UtBS").

64.     On multiple occasions, the Board-Certified Behavioral Analysts ("BCaBAs") from UtBS witnessed C.K. being unlawfully restrained by Ms. Anderson or Jane Does 1-5 through the improper use of the Rifton chair.

65.     One BCaBA from UtBS indicated that C.K. was buckled into a Rifton chair by Ms. Anderson or Jane Does 1-5 every day that she was present in the classroom.

66.     She observed that C.K. was not given a choice of whether to get into the Rifton chair nor did he voluntarily buckle himself in the chair.

67.  Multiple BCaBAs from UtBS recalled that C.K. was regularly strapped into the Rifton chair by Ms. Anderson or Jane Does 1-5. The BCaBAs were told by Ms. Anderson that C.K. must be put in the Rifton chair and that it needs to be buckled at all times.

68.  On information and belief, Ms. Anderson or Jane Does 1-5 removed C.K. from the classroom and had him sit in a dark room while strapped into the Rifton chair at any time that the other children were engaged in group activities and lessons or during quiet time.

69.  On one occasion, a BCaBA from UtBS was working with C.K. in a room separate from the rest of the class. C.K. was seated in a regular chair and was not engaged in any problematic behavior. After five to ten minutes, Ms. Anderson entered the room and immediately strapped him into a Rifton chair.

70.  This same BCaBA recalled that the Rifton chair was used at least twice per day on each of the days that she worked with C.K., with C.K. being strapped into the chair for up to 45 minutes at a time.

71.  Another BCaBA from UtBS witnessed Ms. Anderson push C.K. out into the hallway while he was strapped into the Rifton chair and leave him there alone for an extended period.

72.  On another occasion, C.K. was forcefully yanked from a swing by Ms. Anderson after he started to scream in a high-pitched voice.

73.  On information and belief, Ms. Anderson walked over to the swing, grabbed his arm, and forcefully pulled him from the chair, causing him to scream out in pain. When C.K. fell out of the swing onto his knees, Ms. Anderson yanked him to his feet and yelled at him to "Hush!"

74. When one of the BCaBAs from UtBS came to pick up C.K. from school, she witnessed Ms. Anderson or Jane Does 1-5 force C.K. to push his Rifton chair down the hall with both hands. If he let go, they would stop, grab his wrists, and tell him to push the chair. He seemed upset, and the BCaBA heard him whine and say, "Ouch."  In response, Ms. Anderson or Jane Does 1-5 either shushed or ignored him.

75. On several occasions, the BCaBAs from UtBS witnessed Ms. Anderson or Jane Does 1-5 place C.K. in a "super suit," a jumpsuit that was put on backward to prevent him from being able to remove it. They indicate that C.K. was forced to wear the jumpsuit for several hours or until the end of the school day.

76. Records from Dan Peterson indicate that the "super suit" was used by Ms. Anderson or Jane Does 1-5 at least four (4) times in March and April 2018.

77. A BCaBA from UtBS observed that C.K. was restrained in a Rifton chair and left in the hallway by himself for the entire duration of rest time by Ms. Anderson or Jane Does 1-5 even though C.K.'s parents had previously refused consent for this practice.

78. A BCaBA from UtBS also witnessed Ms. Anderson reach out and grab C.K.'s cheeks with her finger and thumb and pinch them together to stop him from screaming.

79. On information and belief, the Kellers did not receive notification from ASD regarding any of the aforementioned incidents witnessed by UtBS.

80. On one occasion, a BCaBA from UtBS came to Dan Peterson to pick up C.K. and witnessed him being walked from the classroom alongside an aide, paraprofessional, or paraeducator with his hands bound behind his back with twine.

81.     When confronted, the aide, paraprofessional, or paraeducator replied, "Oh, it's just twine, it doesn't hurt him, and it keeps everyone safe."

82.     Shortly thereafter, a formal complaint was made to ASD by UtBS regarding the use of twine to bind C.K.'s hands together.

83.     UtBS also generated an "Incident Report" that described the BCaBA's observations and subsequent follow-up with ASD.

84.     There is no evidence that ASD notified Mr. Keller of the incident or the complaint made by UtBS.

85.     ASD policy requires that when physical intervention is used against a student, it must be done in compliance with the established ESI protocol by those trained in the use of such protocols and only when less restrictive means are unavailable. (*See* Alpine School District Policy No. 5180, "Discipline," Rules & Regulations §5.3-5.4, Revised July 3, 2018, Exhibit A, *attached*).

86.     Under ASD Discipline policy, the use of mechanical restraint, except for protective, stabilizing, or legally required mechanical restraints, such as seat belts or safety equipment used to secure students during transportation is prohibited. *Id.* at §5.9.3.4.

87.     Under ASD Discipline policy, physical restraint shall be applied for the minimum amount of time necessary and release conditions must be provided. *Id.* at §5.9.4.1.

88.     Under ASD Discipline policy, physical restraint shall be terminated if the student is in severe distress. *Id.* at §5.9.4.3.

89.  The foregoing requirements of the ASD Discipline policy materially and substantially reflect and incorporate the restraint policy requirements outlined and required by USBE in Utah Admin. Code § 277-609-5 (through September 1, 2019).

90.  On information and belief, USBE does not enforce the mandates of § 227-609-5 or similar policies from Local Education Authorities ("LEA") and does not impose penalties or sanctions for violations of such policies.

91.  Under Ut. Admin. Code § 277- 609(11) the Superintendent [USBE] is required to develop model policies regarding "disruptive student behavior and appropriate consequences." USBE fails to carry out this mandate.

92.  Further, USBE must "provide technical assistance to LEAs in developing and implementing policies and training employees in the appropriate use of physical force and emergency safety interventions to the extent of resources available." *Id.* USBE fails to do this.

93.  Similarly, under subsection (8) of the same code section (*supra*), mandatory reporting requirements are imposed on school districts/ LEAs regarding the use of restraint and seclusion. On information and belief, USBE makes no efforts to enforce this reporting obligation, and few districts comply voluntarily.

94.  Finally, under subsection (12) of the same code section (*supra*), USBE is explicitly autorized to withhold funds if a school district/ LEA fails to comply with these rules. On information and belief, USBE fails to exercise this enforcement power, and specifically failed to do so with regard to ASD in matters complained of herein.

95.   ASD policy requires that when a district employee observes any physical abuse or has reason to believe that physical abuse has occurred, they must immediately report it to the law enforcement or child protection authority. (*See* Alpine School District Policy No. 5420, "Reporting Child Abuse/Neglect of Minors," §1.1, Approved January 2006, <u>Exhibit B</u>, *attached*).

96.   ASD Child Abuse policy states that when an employee required to report a case of abuse fails to do so, they may be guilty of a class B misdemeanor. *Id.* at §1.5.

97.   Utah Code Ann § 62A-4a-403 (1)(a) requires that "when any individual… has reason to believe that a child has been subjected to abuse or neglect, or observes a child being subjected to conditions or circumstances that would reasonably result in abuse or neglect, that individual shall immediately report the alleged abuse or neglect to the nearest peace officer, law enforcement agency, or office of [Child and Family Services]."

98.   Utah Code Ann § 62A-4a-411 states that any person required to report under § 62A-4a-403 "who willfully fails to do so is guilty of a class B misdemeanor."

99.   On information and belief, no reports of child abuse or neglect were made by Ms. Anderson, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, or Jane Doe 5, nor by any other ASD personnel.

100.   By willfully failing to report child abuse witnessed first-hand, Ms. Anderson, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, and Jane Doe 5 violated numerous ASD policies (*supra, passim*), USBE policies (*supra*), as well as U.C.A. § 62A-4a-403.

101.    These flagrant violations of written policies and state law demonstrate system-wide negligence in ASD's failure to appropriately train employees who instruct, support, educate, and as a most basic function, *protect* students with disabilities.

102.    C.K. was subjected to violations of his fundamental human and civil rights as a direct and foreseeable consequence of ASD's denial of his right to integrated educational settings as provided under the ADA and Rehab Act.

103.    C.K. was subjected to violent acts and violations of his Fourth Amendment rights as a direct and foreseeable consequence of ASD's denial of his right to integrated educational settings as provided under the ADA and Rehab Act, and as guaranteed by the Equal Protection clause of the Fourteenth Amendment.

104.    C.K. was subjected to neglect, abuse, unlawful restraint and seclusion, and violations of his basic human and civil rights while his non-disabled peers were protected from such by ASD's selective enforcement of its own policies in a manner that discriminates against and confers unequal, inferior benefits on students with disabilities, all in violation of his rights under the ADA, the Rehab Act, and the Equal Protection clause of the Fourteenth Amendment.

105.    C.K. was subjected to systemic neglect, abuse, and unlawful restraint and seclusion at a segregated school in violation of the ADA and Rehab Act.

106.    In failing to disclose to C.K.'s parents and appropriate law enforcement and/or child protection agencies, the repeated child abuse perpetrated and facilitated by its employees, ASD violated its internal policies and state law.

107.   On information and belief, ASD consistently reports to law enforcement and appropriate state agencies any instance of abuse, neglect, or assault by ASD staff against non-disabled students.

108.   The stark contrast in its approach to the instances of abuse, neglect, and assault of C.K. and those situations in which staff has abused, neglected, or assaulted non-disabled students demonstrates a pattern of discrimination in the enforcement of ASD policy and its compliance with state law. Such discriminatory treatment violates the rights afforded C.K. under the ADA and Rehab Act, as well as the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution, as applicable to the states.

109.   In October 2018, Mr. and Mrs. Keller learned from UtBS that C.K. had been bound with twine.[3] In the months that followed, additional details regarding that situation and other events that took place at Dan Peterson have come to light.

110.   The additional details obtained by Mr. and Mrs. Keller regarding the events at Dan Peterson have shown repeated and continual violations of C.K.'s fundamental civil rights as well as his rights under the ADA and Rehab Act, even after the Kellers revoked any possible consent to use such materials or procedures.

**CAUSES OF ACTION**

111.   Plaintiff, C.K. repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference.

---

[3] The egregious nature of the actions taken by the ASD defendants also meet the elements for several Utah tort claims. Pursuant to the Utah Governmental Immunity Act, UCA § 63G-7-101 *et seq.*, a notice of claims was served on ASD defendants on October 9, 2019. In accordance with the Act, Plaintiffs must wait 60-days before causes of action in the notice of claims can be filed as pendent state law claims in the instant federal action. Therefore, Plaintiff will seek leave of the court to amend this complaint to add pendent state law claims as authorized under 28 U.S.C. § 1367, and pursuant to Fed. R. Civ. Pro. 15(a)(2) upon the completion of the statutory waiting period.

112. C.K. brings this action under Title II of the ADA, 42 U.S.C. §12131, *et seq.* (2002); the Rehabilitation Act 29 U.S.C. § 794, *et seq* (2011); the Fourth Amendment, applied to the states by the Due Process Clause of the Fourteenth Amendment; the guarantees of Equal Protection of the laws contained in the Fourteenth Amendment, and 42 U.S.C. §1983 (1996).

113. "[A]ny department agency, special purpose district, or other instrumentality of a State or States or local government" are Public Entities under the ADA. 42 U.S.C. § 12131(1)(B).

114. Under the Rehabilitation Act, "a local education agency" is a covered "program or activity," if they receive Federal funds. 29 U.S.C. § 794(b)(2)(B).

115. Title II of the ADA prohibits, *inter alia*, discrimination on the basis of disability by any public entity. *See* 42 U.S.C. § 12132 (2010). Public entities, in order to avoid discrimination, must "make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (2008). In addition, "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." *Id.* at § 35.130(a). Finally, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* at §35.130(d).

116.  The Rehabilitation Act prohibits discrimination on the basis of disability by any covered
      program or activity receiving financial assistance from the Federal government.  29
      U.S.C. § 794(a).  Discrimination under the Rehabilitation Act includes a covered entity,
      in providing an "aid, benefit, or service," denying a qualified individual with a disability
      "the opportunity to participate in or benefit from the aid, benefit or service."  34 C.F.R. §
      104.4(b)(1)(i) (2012).  Covered entities also must not provide those aids, benefits, or
      services to qualified individuals with disabilities in a manner that is not equal to or as
      effective as that provided to others.  *Id.* at §§ 104.4(b)(1)(ii)-(iii).

117.  As described, *supra*, defendants denied C.K. benefits of their services solely on the basis
      of his disability.  Defendants have also failed to modify their policies and procedures to
      avoid this discrimination against C.K.  The educational services being provided to C.K.
      are not equal to or as effective as those provided to others, and he is not being served in
      the most integrated setting appropriate.

118.  Under the ADA, defendants are not required "to permit an individual to participate in or
      benefit from the services, programs, or activities of that public entity when that individual
      poses a direct threat to the health or safety of others."  28 C.F.R. § 35.139(a) (2016).

119.  However, in making that determination, defendants "must make an individualized
      assessment, based on reasonable judgment that relies on current medical knowledge or on
      the best available objective evidence, to ascertain: the nature, duration, and severity of the
      risk; the probably that the potential injury will actually occur; and whether reasonable
      modifications of policies, practices, or procedures or the provision of auxiliary aids or
      services will mitigate the risk."  *Id.* at § 35.139(b).

120.   Further, "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities.  However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  *Id.* at § 35.130(h) (2008).

121.   Defendants did not adhere to the requested accommodation requested by Parents which included measures necessary to protect C.K. from problems associated with his disability. This failure and lack of understanding by defendants led to C.K. being placed in harm's way.

122.   Defendants failed to make reasonable accommodations to policies and procedures when necessary to ensure that those protected under the ADA and Rehabilitation Act, such as C.K., are given equal and complete access to the benefits and services provided to those without a disability when they failed to require additional training or individualized knowledge for those teachers, paraprofessionals, paraeducators, service providers, and aides that ensure the safety of special needs children, including C.K.

123.   Because defendants refused to modify their policies for C.K. and denied him full and equal access to its school based solely on his disability, they have violated Title II of the ADA and the Rehabilitation Act.

124.   C.K., despite his disabilities, is qualified to attend a range of defendants' schools and programs provided that reasonable accommodations and auxiliary services are established, updated as necessary, and adhered to by all ASD employees and staff. Defendants' denial of access and failure to accommodate, solely on the basis of C.K.'s disabilities, constitutes intentional disability-based discrimination.

125.   Defendants' conduct, described above, was intentional and taken in reckless disregard of the rights afforded C.K. under the ADA and Rehabilitation Act.

126.   Defendants' conduct described above had the effect denying C.K. the equal protection of the law, on the basis of his disability, in violation of the Equal Protection and Due Process clauses of the Fourteenth Amendment to the U.S. Constitution.

127.   Additionally, the physical violence, abuse, and unlawful restraint and seclusion inflicted upon C.K. by Ms. Anderson or Jane Does 1-5 constitutes an unconstitutional seizure under the Fourth Amendment of the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment.

## FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR EQUITABLE RELIEF
*~ Failure to Modify Policies, Practices, or Procedures in Violation of the ADA ~*

128.   Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

129.   Pursuant to Title II of the ADA, defendants are prohibited from failing to make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination unless such criteria can be shown to "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

130.   Defendants' refusal to modify their policies, practices, or procedures prevents C.K. from accessing their educational services.  The reasonable modifications needed by C.K., if provided, would not constitute a fundamental alteration of those services, as additional training is required of a wide range of other occupations and positions within ASD which deal with special education programs and special needs children. Defendants' actions

result in discrimination based on C.K.'s disabilities, in violation of Title II of the ADA and implementing regulations.

### SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR EQUITABLE RELIEF
*~ Denial of Access in Violation of the ADA ~*

131.  Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

132.  Title II of the ADA prohibits public entities, such as ASD and other defendants, from discriminating against a person with a disability because of their disability by denying them the opportunity to participate in or benefit from the services, programs, or activities of the entity.  42 U.S.C. § 12132 (2010).

133.  Defendants' persistent, repeated exclusion and removal of C.K.  from the classroom environment by restraing and secluding him in separate rooms, hallways, and other isolated places,deniesC.K. access toschool services because of his disabilities, and discriminates against him by denying him the opportunity to participate in and benefit from the educational services defendants offer, in violation of the ADA and implementing regulations.

### THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR EQUITABLE RELIEF
*~ Failure to Provide Services in the Most Integrated Setting Appropriate to C.K.'s Needs in Violation of the ADA ~*

134.  Plaintiff, C.K., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

135.    As a public entities under Title II of the ADA, ASD and other defendants must administer their services "in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (2008).

136.    Defendants' insistence that C.K. receive a segregated educational experience, where he is placed in greater jeopardy of unreported abuse and neglect, and where he is more likely to be denied reasonable and necessary modifications, is a failure to administer services to him, a qualified individual with a disability, in the most integrated setting appropriate to his needs, in violation of Title II of the ADA and implementing regulations.

**FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
FOR EQUITABLE RELIEF**
*~ Denial of Participation in Education Services in Violation of the Rehab Act ~*

137.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

138.    Under the Rehab Act, a recipient of Federal financial assistance must not deny a qualified individual "the opportunity to participate in or benefit from the aid, benefit, or service" they provide.  34 C.F.R. § 104.4(b)(1)(i) (2012).

139.    Defendants have refused C.K. the opportunity to participate in, and to fully and equally benefit from, its special education programs and education, based solely upon his disability in violation of the Rehab Act.

**FIFTH CLAIM FOR AGAINST ALL DEFENDANTS FOR EQUITABLE RELIEF**
*~ Providing Unequal and Less Effective Educational Services in Violation of the Rehab Act ~*

140.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

141.   The Rehab Act prohibits a covered entity from providing aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others.  *Id.* at §§ 104.4(b)(1)(ii)-(iii).

142.   Because of his disability, and due to defendants' consistent failures to appropriately meet his needs, defendants' default approach has been C.K.'s removal and seclusion from his classroom, where he is limited  to receiving inherently unequal and inferior to and less effective educational services than those provided to other students without disabilities or the other disabled students in his class, which violates the Rehab Act and implementing regulations.

**SIXTH CLAIM FOR RELIEF AGAINST USBE FOR EQUITABLE RELIEF**
*~ Failure to Provide Oversight and Enforcement in Violation of the ADA ~*

143.   Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

144.   Title II of the ADA prohibits public entities, such as ASD and other defendants, from discriminating against a person with a disability because of their disability by denying them the opportunity to participate in or benefit from the services, programs, or activities of the entity.  42 U.S.C. § 12132 (2010).

145.   The Utah Constitution vests USBE with the general control and supervision of the state public education system. Utah Const. Art. X § 3.

146.   Through the persistent and repeated failure of USBE to supervise the actions of public education entities, such as ASD, or enforce their own policies, USBE has created an

environment in which the systemic abuse, neglect, and unlawful restraint and seclusion of C.K. could occur without repercussion in violation of the ADA.

### SEVENTH CLAIM FOR RELIEF AGAINST USBE FOR EQUITABLE RELIEF
*~ Failure to Provide Oversight and Enforcement in Violation of the Rehab Act ~*

147.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

148.    The Rehab Act prohibits a covered entity from providing aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others.  *Id.* at §§ 104.4(b)(1)(ii)-(iii).

149.    The Utah Constitution vests USBE with the general control and supervision of the state public education system. Utah Const. Art. X § 3.

150.    Through the persistent and repeated failure of USBE to supervise the actions of public education entities, such as ASD, or enforce their own policies, USBE has created an environment in which the systemic abuse and neglect of C.K. could occur without repercussion in violation of the Rehab Act.

### EIGHTH CLAIM FOR RELIEF AGAINST ASD DEFENDANTS
### FOR EQUITABLE AND LEGAL RELIEF
*~ Unlawful Seizure in Violation of the Fourth Amendment of the United States Constitution as Applied to the States Through the Due Process Clause of the Fourteenth Amendment; Denial of Equal Protection on the Basis of Disability, in Violation of the Equal Protection Clause of the Fourteenth Amendment ~*

151.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

152.   The Fourth Amendment of the United States Constitution provides that "the right of the people to be secure…against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. 4.

153.   The United States Supreme Court has ruled that the protections against unreasonable searches and seizures applies to the states under the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).

154.   Defendants unreasonably seized C.K. through the actions of Ms. Anderson, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, and Jane Doe 5 which extended far beyond any contemplated intervention tactic of ASD related to behavioral issues of children within their purview. The repeated restraint of C.K. with unauthorized materials and/or procedures constitutes a violation of C.K.'s fundamental right against unreasonable seizure.

155.   As alleged above, the ASD defendants deprived C.K. of the full and equal protection of the law, solely on the basis of his disability, by placing him in an inherently dangerous environment, staffed by completely untrained staff, and in stark contrast to the superior services and protections provided to students without disabilities, in violation of the Equal Protection clause of the Fourteenth Amendment.

### NINTH CLAIM FOR RELIEF AGAINST ASD  DEFENDANTS FOR EQUITABLE AND LEGAL RELIEF
*~ Deprivation of Civil Rights by Defendants Acting Under Color of Law ~*

156.   Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

157.   C.K. is a qualified person with a disability and is entitled to the protections afforded by the ADA and Rehab Act, as described herein.

158.   Under color of state law, defendants by their conduct herein alleged, willfully and without justification discriminated against C.K. on the basis of his disability and have deprived C.K. of his right to reasonable accommodation and full benefits of a public program as afforded by the ADA and Rehabilitation Act, in violation of 42 U.S.C. § 1983.

159.   As a result of these deprivations of his rights under federal law, C.K. has suffered anxiety and other distress by being forced to endure repeated abuse at the hands of ASD employees tasked with providing C.K. with protection while at Dan Peterson.

160.   By virtue of their foregoing conduct, defendants have violated 42 U.S.C. § 1983 and C.K. is entitled such relief as the Court finds to be appropriate, including, but not limited to, declaratory relief, injunctive relief, compensatory damages, punitive damages, and the costs and expenses of this action.

## DECLARATORY RELIEF

161.   This action seeks declaratory relief pursuant to 28 U.S.C. § 2201 (2011) for the purpose of determining a question of actual controversy between plaintiff and defendants.

162.   Plaintiff, C.K., is entitled to a declaratory judgment concerning each of defendants' violations of the ADA and implementing regulations, as well as their violations of the Rehabilitation Act and implementing regulation and specifying C.K.'s rights with regard to defendants' services and facilities.

## INJUNCTIVE RELIEF

163.   This action seeks injunctive relief pursuant to 42 U.S.C. § 12188 and Rule 65 of the Federal Rules of Civil Procedure.

164.   Plaintiff, C.K., is entitled to a permanent injunction requiring that each and every

defendant correct their respective violations of the ADA, Rehabilitation Act, and

applicable implementing regulations as such relate to C.K., and requiring that each

defendant also be enjoined from any further discriminatory exclusion of C.K. from their

school system and services, and that C.K. and others similarly situated receive the full

and equal benefit of the enforcement mechanisms and regimes of USBE such that

flagrant violation of federal statutes and constitutional rights by school districts such as

ASD are effectively exposed,  reasonably investigated, consistently punished, and

otherwise effectively deterred.

165.   With regard to defendant USBE, plaintiff C.K. is entitled to a permanent injunction

requiring that USBE's administrative rule-making, dispersal of federal funds to school

districts, budgetary and programmatic oversight of school districts, and all enforcement

activities aimed at ensuring that school districts comply with their legal obligations are

carried out in strict conformance with the mandates of the ADA and the Rehab Act; and

that USBE fulfill its duties, including but not limited to: ensuring meaningful compliance

by Utah school districts with the integration mandates of the ADA as informed by

*Olmstead v. L.C.*, 527 U.S. 581 (1999), and its progeny; aggressively enforcing strict

compliance by school districts with the reasonable accommodation mandates as set forth

in both the ADA and the Rehab Act; and by providing an effective, robust, and

meaningful set of mechanisms, procedures, and administrative process aimed at

protecting students with disabilities and which effectively deter unlawful school district

policies, practices, customs and conduct which subject students such as C.K. to the harms

complained of herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff C.K. requests that the Court:

1. Exercise jurisdiction over this action;

2. Enter a declaratory judgment on behalf of C.K., declaring that all of the defendants'

actions described herein are in violation of Title II of the ADA, Section 504 of the

Rehabilitation Act, and their implementing regulations;

3. Enter a declaratory judgment on behalf of C.K., declaring that the ASD defendants'

actions are in violation of the Fourth Amendment proscription against unreasonable

seizure, and that the ASD defendants' policies violate C.K.'s right to Equal Protection of

the laws, as provided in the United States Constitution, and which apply to the states

through the Due Process Clause of the Fourteenth Amendment;

4. Enter a declaratory judgment that the ASD defendants' actions are in violation of 42

U.S.C. § 1983 inasmuch as they violated C.K.'s rights under clearly established federal

statutes and the Constitution of the United States, as described herein.

5. Enter a permanent mandatory injunction ordering all defendants to cease their

exclusion of C.K. from their public schools, and ordering defendants to grant C.K.'s

requested modifications and effectively accommodate C.K.'s disability; ordering all

defendants to cease their exclusion of C.K. and other disabled persons from participation

or benefits of services and activities when the exclusion or denial occurs by reason of

such disability; and an order directing all defendants to otherwise comply in all respects

with their various obligations under the ADA and Rehab Act.

6.   An award of general and special damages against all ASD defendants, as to be determined by the Court, but at least nominal in amount; including an award of appropriate punitive damages against ASD for the extraordinary, outrageous, egregious, and shocking conduct complained of herein; conduct which was encouraged and caused by ASD's intentionally discriminatory system of educating students with disabilities in inherently separate and unequal settings, and conduct which was the foreseeable and proximate result of ASD's deliberate indifference and complete dereliction of its duty to adequately train and supervise employees who serve students with disabilities, including C.K.

7.  Award to C.K. all costs and attorney's fees expended herein and assess all such costs against defendants;

8. Grant C.K. such other and further relief as may be deemed just, equitable and appropriate by the Court.


RESPECTFULLY SUBMITTED THIS THE 7th DAY OF NOVEMBER 2019.

DISABILITY LAW CENTER

Attorneys for Plaintiff


By  */s/ Aaron  Kinikini*
        AARON M. KINIKINI
        LAURA HENRIE

<u>CERTIFICATE OF SERVICE</u>

I, Jennifer Carver hereby certify that the foregoing COMPLAINT is being electronically filed using the CM/ECF system on this 7th day of November 2019, which will send notices of such filing to all registered CM/ECF users

*/s/ Jennifer Carver_____*