AARON M. KINIKINI (Bar No. 10225)
LAURA HENRIE (Bar No. 12449)
MICHELLE MARQUIS (Bar No. 16889)
Disability Law Center
205 North 400 West
Salt Lake City, Utah 84103
Phone: (801) 363-1347
Fax: (801) 363-1437
Email:  akinikini@disabilitylawcenter.org
        lhenrie@disabilitylawcenter.org
        mmarquis@disabilitylawcenter.org


*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ADAM KELLER, as legal guardian of C.K., a minor child; <br><br> Plaintiff, <br><br> v. <br><br> ALPINE SCHOOL DISTRICT; Alpine School District Board of Education; Tarra Anderson, in her official and individual capacity; Jane Does 1–5, in their official and individual capacities; <br><br> Defendants. | **FIRST AMENDED COMPLAINT** <br><br> (Jury Demand) <br><br><br> Civil No. 2:19-cv-00874-DBP <br> Magistrate Judge Dustin B. Pead |

## INTRODUCTION

This is a civil rights action brought on behalf of C.K., a vulnerable child with multiple,

significant disabilities, who was subjected to cruel and unconscionable abuse and neglect at the

hands of public school staff tasked not only with providing appropriate educational services, but at a minimum, ensuring C.K.'s physical safety and fundamental human rights. Plaintiff seeks damages and equitable relief from the unlawful policies, practices, actions and/or inactions of defendant ALPINE SCHOOL DISTRICT, as controlled by defendant ALPINE SCHOOL DISTRICT BOARD OF EDUCATION, and where such practices and customs were ultimately enforced and implemented by defendants TARRA ANDERSON and JANE DOES 1–5 during the routine fulfillment of their daily duties and within the ordinary course and scope of their employment. Such actions and/or inactions have resulted in the continuous and prolonged abuse and neglect of C.K. over a period of several months and included the deprivation of food and water, unlawful restraint and seclusion, improper use of special needs equipment, and physical abuse.

Therefore, Plaintiff, C.K., through his legal guardian, ADAM KELLER, by and through counsel, Disability Law Center, complains, states, alleges, and claims as causes of action against defendants as follows:

## <u>NATURE OF THE CLAIMS</u>

This 42 U.S.C. § 1983 action seeks damages and equitable relief from the unlawful policies, practices, actions and/or inactions of defendant ALPINE SCHOOL DISTRICT, as controlled by defendant ALPINE SCHOOL DISTRICT BOARD OF EDUCATION, and actions taken pursuant to such policies and practices, and within the scope and course of their employment by individual and official capacity defendants TARRA ANDERSON and JANE DOES 1–5 (all the foregoing Alpine School District personnel and entities are collectively and hereinafter, "the ASD defendants").

Plaintiff seeks declaratory judgment, permanent injunctive relief, and damages as well as

legal and equitable relief from defendants' policies and actions that have violated and continue to

violate plaintiff's rights pursuant to Title II of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. § 12131 *et seq.* (2002), and Section 504 of the Rehabilitation Act ("Rehab

Act"), 29 U.S.C. § 794 *et seq* (2011). Plaintiff also brings claims under the United States

Constitution, for violations of his right to be free from forcible and unreasonable seizure of his

person as guaranteed by the Fourth Amendment, and for violations of his right to Equal Protection

of the laws, both of which have been secured against the states by the Fourteenth Amendment to

the U.S. Constitution. Finally, Plaintiff brings claims for deprivations of his fundamental liberty

interest to be free from abuse and restraint without due process of law, also in violation of the

protections guaranteed by the Due Process Clause of the Fourteenth Amendment to the United

States Constitution.

Plaintiff seeks injunctive relief requiring defendants to correct their violations of plaintiff's

rights, prohibiting defendants from continuing their misconduct in violation of his rights under the

U.S. Constitution, the ADA and the Rehab Act; and prohibiting defendants from engaging in similar

conduct in the future.

Plaintiff seeks attorney's fees and court costs pursuant to 42 U.S.C. § 12205 (2010) and 29

U.S.C. § 794(a), and under 42 U.S.C. § 1983 and § 1988.

## **PARTIES**

1.    Plaintiff C.K. is and was at all times alleged herein a citizen and resident of the State of

Utah. C.K. is a qualified person with a disability as defined by the ADA and the Rehab

Act. C.K. is a minor, limiting his ability to protect his legal interests. His father and legal

guardian, ADAM KELLER ("Mr. Keller"), must, therefore, represent his interests.

2.     Defendant ALPINE SCHOOL DISTRICT ("ASD") is a public-school district providing educational services to children in the State of Utah. It is a public entity subject to Title II of the ADA and a recipient of federal funds subject to the Rehab Act, and a "person" within the meaning of 42 U.S.C. § 1983 ("§ 1983"). ASD is sued for both legal and equitable relief.

3.     Defendant ALPINE SCHOOL DISTRICT BOARD OF EDUCATION ("Alpine School Board") leads and directs the actions, policies, and practices of ASD and consists of seven elected members. The Alpine School Board is and was at all times material hereto charged with the supervision, control, and management of all matters relating to the public schools within ASD boundaries. Alpine School Board is a public entity subject to the ADA and a recipient of federal funds subject to the Rehab Act. Alpine School Board is a "body corporate" as defined by Utah statute, and may sue and be sued. U.C.A. § 53G-4-401(4). The Alpine School Board is a "person" as defined § 1983 and is sued for equitable relief only.

4.     Defendant TARRA ANDERSON ("Ms. Anderson") was, at all relevant times, the special education teacher to which C.K. was assigned. Ms. Anderson is being sued in her official and individual capacities as the person directly responsible for allowing and participating in the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

5.     Defendant JANE DOE 1 ("Jane Doe 1") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education

classroom. Jane Doe 1 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

6.      Defendant JANE DOE 2 ("Jane Doe 2") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 2 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

7.      Defendant JANE DOE 3 ("Jane Doe 3") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 3 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

8.      Defendant JANE DOE 4 ("Jane Doe 4") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 4 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

9.    Defendant JANE DOE 5 ("Jane Doe 5") was, at all relevant times, an aide, paraprofessional, or paraeducator assigned to assist Ms. Anderson in the special education classroom. Jane Doe 5 is being sued in her official and individual capacities as one of the people directly responsible for the abuse and neglect of C.K. and the violation of his civil rights under color of law, as well as for her failure under Alpine Policy and Utah law to report the incidents to law enforcement. She is being sued for legal and equitable relief.

10.    At all relevant times, all defendants were, are, and will be acting under color of state law, custom, and usage, and were and are state actors.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction to hear and decide Plaintiff's ADA and Rehab Act claims pursuant to 42 U.S.C. §12188 (2015),§ 12189 (2008), and 29 U.S.C. § 794(a), as the Plaintiff's claims arise under and are based upon violations of Title II of the ADA, 42 U.S.C. §12182, *et seq*. (2010) and Rehab Act, 29 U.S.C. § 794 *et seq.*

12.    This Court is vested with original jurisdiction of these claims pursuant to 28 U.S.C. §1331 (2011) and §2201 (2015).

13.    This Court has jurisdiction to hear and decide Plaintiff's claims under the U.S. Constitution pursuant to 28 U.S.C. §1331 (2011).

14.    This court has jurisdiction to grant declaratory relief in this action pursuant to 28 U.S.C. § 2201 (2015).

15.    Venue for this action is proper in the United States District Court for the District of Utah, Central Division pursuant to 28 U.S.C. §§ 125 and §1391(b)-(c) (2015)  because all conduct complained of herein occurred or will occur in Utah County, Utah, and the Central Division

of this Court. The subject public entities and services immediately at issue are located in Utah County, Utah. The defendants to this action reside in and/or have official duties in the Central Division of the District of Utah.

## FACTUAL BACKGROUND

16.  C.K. is an 11-year-old individual with multiple disabilities, as defined by the ADA and the Rehab Act.

17.  C.K. is nonverbal and has a diagnosis of Epilepsy, Cortical Dysplasia, Lobectomy (removal of left Temporal, Occipital, and part of Parietal Lobes), Anxiety, and Autism. He had his lobectomy surgery in 2011 when he was three (3) years old.

18.  C.K. at all relevant times attended Dan Peterson School ("Dan Peterson"), which is part of ASD. He is, in every way, a qualified person with a disability and can successfully attend any public school controlled by ASD.

19.  On information and belief, Dan Peterson is a special purpose school where students with moderate to severe special needs are sent within ASD. It is a segregated environment where students with certain disabilities are categorically assigned based solely on the fact that they have those disabilities.

20.  Children without disabilities do not attend Dan Peterson.

21.  C.K. transferred to Dan Peterson from Foothill Elementary in August of 2016 and remained there until June of 2018 when he transferred back to Foothill Elementary.

22.  Foothill Elementary is a typical elementary school that children with, and without, disabilities attend.

23.  On information and belief, this transfer occurred because C.K.'s teacher at Foothill

Elementary suggested that Dan Peterson would be a better fit for C.K.

24.    Mr. and Mrs. Keller ("the Kellers") expressed concerns about Dan Peterson being able to provide a 1:1 aide, along with other requirements needed for C.K.'s care and education. The principal at Dan Peterson assured Mrs. Keller that they specialized in the area of severe special needs and that they would be able to handle C.K. The principal further assured Mrs. Keller that they would provide everything in C.K.'s IEP, and that Dan Peterson was the best place for him despite the Kellers' concerns.

25.    While at Dan Peterson, C.K. was placed in the classroom of Ms. Anderson, who was assisted by five different classroom aides, paraprofessionals, or paraeducators during the relevant period.

26.    Almost immediately after C.K. began attending Dan Peterson, Mr. and Mrs. Keller noticed a marked increase in C.K.'s aggression at home including self-injurious behavior.

27.    C.K. would throw himself on the ground, sob, jump up and bang his head on the wall for approximately an hour after he arrived home from school.

28.    This behavior increased so dramatically that C.K. had a bald spot with a goose egg on the front of his head from where he would bang it.

29.    C.K.'s aggressive behaviors increased both at home and at school during the period he attended Dan Peterson.

30.    This daily behavior stopped after C.K. left Dan Peterson.

31.    At the Kellers' first parent-teacher conference at Dan Peterson, they expressed to Ms. Anderson that Dan Peterson did not seem like a good fit for C.K., that they did not think it was the right school for him nor should he have been moved. Ms. Anderson did not address

these concerns.

32.   Following this parent-teacher conference, at almost every meeting with Ms. Anderson or the IEP team, Mrs. Keller noted that Dan Peterson was not a good fit for C.K. and asked that he be moved back to Foothill Elementary.

33.   The IEP team repeatedly denied the Kellers' requests and responded that C.K. would have to meet behavioral requirements in order to transfer back to Foothill Elementary.

34.   Mrs. Keller renewed her request that C.K. be moved back to Foothill Elementary on at least four occasions prior to June of 2018.

35.   In June of 2018, Mrs. Keller called the principal of Dan Peterson and stated that she wanted C.K. transferred back to Foothill Elementary. On information and belief, the principal responded that this was Mrs. Keller's right as a parent. The principal regularly attended C.K.'s IEP meetings.

36.   Following this call, C.K. transferred back to Foothill Elementary for the 2018-2019 school year.

37.   C.K.'s educational needs were met at Foothill Elementary following this transfer.

38.   C.K. at all relevant times had a Student Health Care Plan that had been created and formally adopted by ASD defendants.

39.   On information and belief, a Student Health Care Plan is a document created to memorialize and ensure the appropriate treatment of unique medical, emotional, or behavioral needs of a student for whom such is deemed medically appropriate.

40.   C.K.'s Student Health Care Plan contained specific information regarding C.K.'s diagnoses and disabilities, his physical, mental and emotional limitations, detailed descriptions of his

unique behavioral tendencies, and importantly, it provided information regarding his diet and medical needs.

41. The information included in the Student Health Care Plan included specific diet and medication information such as: C.K. is on a specialized diet due to seizures (sliced apples are suggested as a motivator), C.K. has been prescribed on Risperdal (for behaviors), Zonisamide (for seizures), and Versed (for rescue), C.K. needs water frequently to avoid dehydration due to his medications, and C.K. has a difficult time regulating his temperature also as a result of his medication.

42. The Student Health Care Plan was created by ASD for the guidance of ASD staff and for the benefit and protection of C.K. The plan was signed by Ms. Anderson and the school nurse indicating that they read and agreed with the plan as written for C.K.

43. In March 2017, the Kellers started to receive notes in C.K.'s "Communication Folder," informing them that Ms. Anderson or Jane Does 1-5 were withholding snacks from C.K. because of his behavior.

44. The Kellers contacted C.K.'s medical provider who wrote a letter to the school requesting that the staff not withhold food from C.K.

45. In the letter, C.K.'s medical provider explained that C.K. was on medication that tended to increase his hunger. She explicitly requested that the individuals working with C.K. not restrict his food and advised that, as a result of the medication, he may need more frequent snacks.

46. Mrs. Keller subsequently provided this letter to the staff at Dan Peterson.

47. This letter served as a request for reasonable accommodation that ASD personnel modify

any existing practice or policy that denied children snacks for exhibiting poor behavior, inasmuch as C.K.'s specific disability, medical well-being, and ultimately his equal participation in the educational services offered depended on his being provided consistent, regular nutrition and hydration.

48. In a meeting held shortly thereafter, Mrs. Keller requested that Ms. Anderson or Jane Does 1-5 provide C.K. with a healthy snack rather than withholding food if he had negative behavior.

49. The staff at Dan Peterson reluctantly agreed that they would no longer restrict C.K.'s food.

50. Following the meeting and up until the time that he transferred from Dan Peterson, C.K. consistently came home from school noticeably famished and dehydrated.

51. It was not unusual for C.K to want to eat continuously for up to 3 hours after arriving home from school.

52. On information and belief, Ms. Anderson or Jane Does 1-5 continued to punitively withhold food and water from C.K. as a result of behavior inextricably linked to his disabilities.

53. Although the Kellers provided ASD with a letter from C.K.'s medical provider, and though ASD created and was aware of C.K.'s Student Health Care Plan, ASD chose not to follow these crucial instructions, effectively denying Parents' clearly stated and frequently repeated requests for reasonable accommodation, penalizing C.K. for exhibiting behaviors associated with his disability and failing to comply with its own internally created Student Health Care Plan.

54. On September 15, 2017, the Kellers received a note in C.K.'s "Communication Folder,"

informing them that C.K. had been restrained in a "Rifton chair" and removed from the classroom and placed in the hallway as a punishment for his behavior, which was described as screaming.

55. On information and belief, a Rifton Chair is a mechanical aid intended to help children who need support in developing the ability to sit upright and maintain posture, and is intended for appropriate, prescribed use by a qualified medical provider or physical therapist. It is a high-backed chair with armrests, straps, and supports, and often on wheels for movement between activities.

56. When buckled in a Rifton chair, a person's mobility is necessarily limited.

57. C.K. has no medical need for the support of a Rifton chair.

58. C.K.'s Student Health Care Plan contains no mention of a Rifton chair.

59. A Rifton Chair is universally rejected as a behavior modification tool, or a valid punitive restraint tool.[1] Its improper use as a punitive restraint has resulted in deaths, serious injury, and has been the subject of frequent litigation.[2] Despite having no medical need, Ms. Anderson began putting C.K. in the Rifton chair.

---

[1] Guidance from the manufacturer of the Rifton Chair in its user manual contains the following: "*A Warning Against Restraints: Using straps, trays or supports to restrict a child's movement is considered behavioral restraint, which may raise ethical and legal issues for your facility. Rifton Equipment is not intended for this use. See* https://cdn.rifton.com/-/media/files/rifton/product-brochures-and-additional-info/straps-supports-poster-english.pdf?la=en (last visited November 7, 2019).

[2] A study and report on the use of restraint and seclusion in public schools by the U.S. Government Accountability Office (GAO) in 2009 involved the examination of selected closed school injury and death cases, including police and autopsy reports and school policies on restraint or seclusion related to these cases. In the resulting GAO report, *Examining the Abusive and Deadly Use of Seclusion and Restraint in Schools* (issued May 19, 2009), the GAO identified several hundred cases of alleged abuse, including deaths that were related to the use of restraint or seclusion of children in public and private schools. The GAO specifically noted that problems with untrained or poorly trained staff were often related to many instances of alleged abuse. *See* https://www2.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf (last visited November 7, 2019).

60.   In January 2018, Mrs. Keller's sister happened to spend one day as a substitute instructor in C.K.'s classroom, where she noted that C.K. was buckled into the Rifton chair for most of the day.

61.   She also overheard Jane Does 1-5 discussing whether to withhold a snack from C.K. due to his behavior despite the letter from his medical provider, the concern expressed by the Kellers, and the prior agreement of staff not to restrict C.K.'s food for medical reasons.

62.   From January through March 2018, the Kellers received additional notes from Dan Peterson in C.K.'s "Communication Folder," indicating that Ms. Anderson or Jane Does 1-5 were using the Rifton chair as a response to C.K.'s behavior (e.g., hitting, kicking, screaming, and pinching).

63.   The Kellers received such notes in C.K.'s "Communication Folder" on January 23, 2018, January 29, 2018, February 5, 2018, February 7, 2018, February 21, 2018, February 22, 2018, and March 12, 2018.

64.   One note sent home on February 5, 2018, indicated that Ms. Anderson or Jane Does 1-5 put C.K. in his Rifton chair out in the hallway for quiet time because he was kicking and screaming, noting that they could keep an eye on him through the window in the classroom door.

65.   A progress report dated January 31, 2018 and documented in C.K.'s Behavior Intervention Plan ("BIP") reads, "when he is head-butting and throwing food at lunch, he sits in the Rifton chair facing the wall until he is ready."

66.   The Kellers were unsettled by the use of the Rifton chair and C.K.'s exclusion from the classroom and brought their concerns to Dan Peterson staff during an IEP/BIP review

FIRST AMENDED COMPLAINT, Page 13 of 42

meeting on or about March 2018.

67.    At the meeting, the Kellers requested that staff stop using the Rifton chair and suggested alternatives to the restraint and exclusion of C.K. from the classroom and peers.

68.    In the meeting, the Kellers asked about the purpose of the Rifton chair, and staff insisted that it was not being used as a disciplinary tool. The staff explained that it was used infrequently and only if C.K. got into it on his own. They also stated that he could get in and out of it whenever he wanted.

69.    When the Kellers asked explicitly whether C.K. was buckled into the Rifton chair by Ms. Anderson or Jane Does 1-5, they were told "no." The staff asserted that if C.K. were to be buckled in the Rifton chair, it was because he did it himself.

70.    C.K. does not possess the fine motor control necessary to buckle himself into the Rifton chair.

71.    Records obtained from Dan Peterson also indicate that C.K. was routinely put in the Rifton chair by Ms. Anderson or Jane Does 1-5 and other related service providers.

72.    In March and April of 2018, C.K. started to receive one-on-one Applied Behavior Analysis ("ABA") treatment at Dan Peterson in Ms. Anderson's classroom through a third-party provider, Utah Behavior Services ("UtBS").

73.    On multiple occasions for a period of weeks, the Board-Certified Behavioral Analysts ("BCaBAs") from UtBS witnessed C.K. being unlawfully restrained on a daily basis by Ms. Anderson or Jane Does 1-5 through the improper use of the Rifton chair.

74.    One BCaBA from UtBS indicated that C.K. was buckled into a Rifton chair by Ms. Anderson or Jane Does 1-5 every day that she was present in the classroom, and for

approximately three-quarters of C.K.'s school day.

75. She observed that C.K. was not given a choice of whether to get into the Rifton chair nor did he voluntarily buckle himself in the chair.

76. She also observed that C.K. was instructed to regularly push a Rifton chair around between activities, including to the lunchroom, and if he did something "naughty," Ms. Anderson or Jane Does 1-5 would strap him into the chair.

77. According to C.K.'s Behavior Intervention Plan ("BIP") through records obtained from Dan Peterson, the target behavior being discouraged was physical aggression, which looks like "kicking, biting, hitting, throwing objects, pulling hair, head butting, pinching, scratching." On information and belief, these are examples of the "naughty" behavior that might result in C.K. being strapped into the Rifton chair.

78. Multiple BCaBAs from UtBS recalled that C.K. was regularly strapped into the Rifton chair by Ms. Anderson or Jane Does 1-5. The BCaBAs were told by Ms. Anderson that C.K. had to be put in the Rifton chair and that it needed to be buckled at all times.

79. On information and belief, Ms. Anderson or Jane Does 1-5 removed C.K. from the classroom and had him sit in a dark room while strapped into the Rifton chair any time that the other children were engaged in group activities and lessons or during quiet time. As a result, C.K. was unable to participate in classroom activities and benefit from the social aspect of interacting with his peers in the classroom.

80. On one occasion in March-April 2018, a BCaBA from UtBS was working with C.K. in a room separate from the rest of the class. C.K. was seated in a regular chair at a desk and was not engaged in any problematic behavior. After five to ten minutes of C.K. working

well in this setting, Ms. Anderson entered the room and immediately strapped C.K. into a Rifton chair. Ms. Anderson did not ask the BCaBA how C.K. was doing or what, if any, additional support was required.

81.     This same BCaBA recalled that the Rifton chair was used at least twice per day on each of the days that she worked with C.K., with C.K. being strapped into the chair for up to 45 minutes at a time.

82.     When one of the BCaBAs from UtBS came to pick up C.K. from school, she witnessed Ms. Anderson or Jane Does 1-5 force C.K. to push his Rifton chair down the hall with both hands. If he let go, they would stop, grab his wrists, and tell him to push the chair. He seemed upset, and the BCaBA heard him whine and say, "Ouch." In response, Ms. Anderson or Jane Does 1-5 either shushed or ignored him.

83.     A BCaBA from UtBS observed that C.K. was restrained in a Rifton chair and left in the hallway by himself for the entire duration of quiet time by Ms. Anderson or Jane Does 1-5 even though C.K.'s parents had previously refused consent for this practice.

84.     A conservative estimate yields that C.K spent multiple hours per day, multiple days per week, in the Rifton chair from September 2017 to May of 2018.

85.     During the time C.K was in a Rifton chair, he was largely immobilized, often completely separated from his classmates and removed from the classroom, and unable to access the typical educational environment.

86.     On information and belief, the Kellers did not receive notification from ASD regarding any of the aforementioned incidents witnessed by UtBS personnel.

87.     On one occasion, on or about May 5, 2018, a BCaBA from UtBS came to Dan Peterson to

pick up C.K. and witnessed him being walked from the classroom alongside an aide, paraprofessional, or paraeducator with his hands bound behind his back with twine.

88.    When confronted by the BCaBA, the aide, paraprofessional, or paraeducator replied, "Oh, it's just twine, it doesn't hurt him, and it keeps everyone safe."

89.    Shortly thereafter, a formal complaint was made to ASD by UtBS regarding the use of twine to bind C.K.'s hands together. The BCaBA who witnessed the incident first called the ASD administration office and spoke to a woman for approximately fifteen minutes, wherein she provided information about C.K.'s name, classroom, school, a description of the incident, and date of the incident. UtBS subsequently relayed the same information to ASD in writing.

90.    UtBS also generated an "Incident Report" that described the BCaBA's observations and subsequent follow-up with ASD.

91.    There is no evidence that ASD notified Mr. Keller of the incident or the complaint made by UtBS.

92.    When UtBS personnel subsequently inquired about the status of the formal complaint, they were told by ASD that they had no record of such a complaint.

93.    The use of physical restraint as punishment or to enforce compliance has been found to be so extremely detrimental to the mental and physical health of children that it has been prohibited by every level of state and federal government having any authority over special education, including the State of Utah and Utah State Board of Education.

94.    The use of restraint has been found to be dehumanizing, humiliating, and physically dangerous.

95.     Because of the extreme danger posed by restraints, Utah Admin Code § 277-609-5(5) states that, "[a]n LEA may not use physical restraint as a means of discipline or punishment." (through September 1, 2019).

96.     The Utah Admin Code permits mechanical restraints only when necessary to prevent serious imminent bodily harm. Utah law also protects against the excessive use of restraint, and requires that every incident of restraint be documented, reported, and reviewed.

97.     Dan Peterson's use of mechanical restraint on C.K. violated the rules enacted by the State of Utah, and was a significant departure from professional judgement.

98.     ASD Defendants knew or should have known that their use of restraints violated Utah Code and state and federal law.

99.     The primary role of Ms. Anderson and Jane Does 1-5 was to educate children with significant disabilities. Training and knowledge of the policies and procedures, and legal requirements for the appropriate and approved use of restraint, is essential to provide an education to children under their supervision.

100.    The use of twine to bind a child's arms is a form of mechanical restraint.

101.    Placing a child in a Rifton chair is a form of mechanical restraint.

102.    The use of binding a child's arms with twine and the use of a Rifton chair for punishment or restraint is explicitly forbidden.

103.    C.K. was restrained for engaging in behaviors that are inextricably linked to his disability. He was restrained as a punishment. He was restrained for the convenience of the Defendants. He was restrained because he was placed at a school where such equipment was readily available. He was restrained because it was easier for the Defendants than

appropriately addressing his behaviors.

104.    ASD's discipline policy materially and substantially reflects and incorporates the restraint policy requirements outlined and required by the Utah State Board of Education in Utah Admin. Code.

105.    ASD policy requires that when physical intervention is used against a student, it must be done in compliance with the established ESI protocol by those trained in the use of such protocols and only when less restrictive means are unavailable. (*See* Alpine School District Policy No. 5180, "Discipline," Rules & Regulations §5.3-5.4, Revised July 3, 2018, Exhibit A, *attached*).

106.    Under ASD Discipline policy, the use of mechanical restraint, except for protective, stabilizing, or legally required mechanical restraints, such as seat belts or safety equipment used to secure students during transportation is prohibited. *Id.* at §5.9.3.4.

107.    Under ASD Discipline policy, physical restraint shall be applied for the minimum amount of time necessary and release conditions must be provided. *Id.* at §5.9.4.1.

108.    ASD Defendants knew or should have known that their use of restraints violated Utah Code, their own policies governing discipline and restraint, and state and federal law.

109.    On information and belief, Dan Peterson faculty and staff were not adequately trained and supervised concerning the allowable use of mechanical restraints.

110.    None of the aforementioned instances of restraint fall within permissible uses prescribed by the law. Therefore, all instances wherein C.K. was restrained were physical abuse.

111.    ASD policy requires that when a district employee observes any physical abuse or has reason to believe that physical abuse has occurred, they must immediately report it to the

law enforcement or child protection authority. (*See* Alpine School District Policy No. 5420, "Reporting Child Abuse/Neglect of Minors," §1.1, Approved January 2006, <u>Exhibit B</u>, *attached*).

112. ASD Child Abuse policy states that when an employee required to report a case of abuse fails to do so, they may be guilty of a class B misdemeanor. *Id.* at §1.5.

113. Utah Code Ann § 62A-4a-403 (1)(a) requires that "when any individual… has reason to believe that a child has been subjected to abuse or neglect, or observes a child being subjected to conditions or circumstances that would reasonably result in abuse or neglect, that individual shall immediately report the alleged abuse or neglect to the nearest peace officer, law enforcement agency, or office of [Child and Family Services]."

114. Utah Code Ann § 62A-4a-411 states that any person required to report under § 62A-4a-403 "who willfully fails to do so is guilty of a class B misdemeanor."

115. On information and belief, no reports of child abuse or neglect were made by Ms. Anderson or Jane Does 1-5, nor by any other ASD personnel.

116. By willfully failing to report child abuse witnessed first-hand, Ms. Anderson and Jane Does 1-5 violated numerous ASD policies (*supra, passim*) and U.C.A. § 62A-4a-403.

117. In failing to disclose to C.K.'s parents and appropriate law enforcement and/or child protection agencies, the repeated child abuse perpetrated and facilitated by its employees, ASD violated its internal policies and state law.

118. C.K. was subjected to violations of his fundamental human and civil rights as a direct and foreseeable consequence of ASD's denial of his right to integrated educational settings as provided under the ADA and Rehab Act.

119. C.K. was subjected to violent acts and violations of his Due Process and Fourth Amendment rights as a direct and foreseeable consequence of ASD's denial of his right to integrated educational settings as provided under the ADA and Rehab Act, and as guaranteed by the Equal Protection clause of the Fourteenth Amendment.

120. C.K. was subjected to neglect, abuse, unlawful restraint and seclusion, and violations of his basic human and civil rights while his non-disabled peers were protected from such by ASD's selective enforcement of its own policies in a manner that discriminates against and confers unequal, inferior benefits on students with disabilities, all in violation of his rights under the ADA, the Rehab Act, and the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

121. Upon information and belief, Rifton chairs are only ubiquitous at disability-specific schools.

122. Upon information and belief, Foothill Elementary does not have Rifton chairs on the premises.

123. Upon information and belief, nondisabled students are not restrained in Rifton chairs for exhibiting poor behavior.

124. C.K. was subjected to abuse, discrimination, and unlawful restraint and seclusion at a segregated school in violation of the ADA and Rehab Act.

125. In October 2018, Mr. and Mrs. Keller learned from UtBS that C.K. had been bound with twine.[3] In the months that followed, additional details regarding that situation and other

---

[3] The egregious nature of the actions taken by the ASD defendants also meets the elements required to establish ASD's liability for the tort of negligence under Utah law. Pursuant to the Utah Governmental Immunity Act, UCA § 63G-7-101 *et seq.*, a notice of claims was served on ASD defendants on October 9, 2019. In accordance

events that took place at Dan Peterson have come to light.

126.  The additional details obtained by Mr. and Mrs. Keller regarding the events at Dan Peterson show that ASD engaged in repeated and continual violations of C.K.'s fundamental civil rights as well as his rights under the ADA and Rehab Act, even after the Kellers revoked any possible consent to use such materials or procedures.

127.  As a result of the unlawful actions described above, C.K. suffered actual damages, including: injuries to his person as evidenced by an increase in self-injurious behavior, ongoing physical and mental pain, continuous psychological injury, emotional distress, fear, anxiety, and trauma; lost and diminished learning capacity; and expenses for past and future medical care, psychological care, and occupational and behavioral therapies, in an amount to be ascertained according to proof at trial.

## CAUSES OF ACTION

128.  Plaintiff, C.K. repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference.

129.  C.K. brings this action under Title II of the ADA, 42 U.S.C. §12131, *et seq*. (2002); the Rehabilitation Act 29 U.S.C. § 794, *et seq* (2011); the Fourth Amendment, applied to the states by the Due Process Clause of the Fourteenth Amendment; the guarantees of Equal Protection of the laws contained in the Fourteenth Amendment, and 42 U.S.C. §1983 (1996).

---

with the Act, Plaintiff was required to wait 60-days before any cause of action in the notice of claims could be filed as pendent state law claims in the instant federal action. The statutory waiting period has elapsed and Plaintiff now seeks leave of the court to file this First Amended Complaint in order to add pendent state law claims as authorized under 28 U.S.C. § 1367, and pursuant to Fed. R. Civ. Pro. 15(a)(2).

130. "[A]ny department agency, special purpose district, or other instrumentality of a State or States or local government" are Public Entities under the ADA. 42 U.S.C. § 12131(1)(B).

131. Under the Rehabilitation Act, "a local education agency" is a covered "program or activity," if they receive Federal funds. 29 U.S.C. § 794(b)(2)(B).

132. Title II of the ADA prohibits, *inter alia*, discrimination on the basis of disability by any public entity. *See* 42 U.S.C. § 12132 (2010). Public entities, in order to avoid discrimination, must "make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7)(i) (2008). In addition, "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." *Id.* at § 35.130(a). Finally, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* at §35.130(d).

133. The Rehabilitation Act similarly prohibits discrimination on the basis of disability by any covered program or activity receiving financial assistance from the Federal government. 29 U.S.C. § 794(a). Discrimination under the Rehabilitation Act includes a covered entity, in providing an "aid, benefit, or service," denying a qualified individual with a disability "the opportunity to participate in or benefit from the aid, benefit or service." 34 C.F.R. § 104.4(b)(1)(i) (2012). Covered entities also must not provide those aids, benefits, or

services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others. *Id.* at §§ 104.4(b)(1)(ii)-(iii).

### CLAIM ONE: SEEKING EQUITABLE RELIEF – FAILURE TO MODIFY POLICIES, PRACTICES, OR PROCEDURES IN VIOLATION OF THE ADA
*~ Against Alpine School District, Alpine School District Board of Education, and Tarra Anderson in her Official Capacity ~*

134.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

135.    Pursuant to Title II of the ADA, defendants are prohibited from failing to make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination unless such criteria can be shown to "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

136.    Defendants' refusal to modify their policies, practices, or procedures prevents C.K. from accessing their educational services.

137.    Defendants failed to modify their practices when they refused to implement C.K.'s Student Health Plan with fidelity.

138.    Defendants failed to modify their practices when they continued to punitively deny C.K. food and water despite explicit instructions from C.K.'s health provider that those modifications were necessary to ameliorate the effects of medications C.K. was taking due to his disability.

139.    Additionally, Defendants failed to appropriately modify policies and practices when they refused to consider or implement the Kellers' multiple requests for C.K. to be moved back to Foothill Elementary.

### CLAIM TWO: SEEKING EQUITABLE RELIEF – DENIAL OF ACCESS IN

## VIOLATION OF THE ADA
*~ Against Alpine School District, Alpine School District Board of Education, and Tarra Anderson in her Official Capacity ~*

140.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

141.    Title II of the ADA prohibits public entities, such as ASD and other Defendants, from discriminating against a person with a disability because of their disability by denying them the opportunity to participate in or benefit from the services, programs, or activities of the entity. 42 U.S.C. § 12132 (2010).

142.    Defendants denied C.K. the opportunity to benefit from educational services and programs by repeatedly excluding him from the typical classroom environment while being restrained in a Rifton chair.

143.    Defendants similarly denied C.K. the opportunity to participate in and benefit from educational services when they repeatedly secluded C.K. from the classroom in separate rooms, hallways, and other isolated places.

144.    C.K. was placed in the Rifton chair multiple times a day, multiple days per week, from September 2017 to May of 2018.

145.    This practice resulted in C.K losing countless hours of instruction and participation in educational services throughout the 2017-2018 school year.

## CLAIM THREE: SEEKING EQUITABLE RELIEF – FAILURE TO PROVIDE SERVICES IN THE MOST INTEGRATED SETTING APPROPRIATE TO C.K.'S NEEDS IN VIOLATION OF THE ADA
*~ Against Alpine School District, Alpine School District Board of Education, and Tarra Anderson in her Official Capacity ~*

146.    Plaintiff, C.K., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

147.    As public entities under Title II of the ADA, ASD and other defendants must administer their services "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2008).

148.    Defendants did not allow C.K. to receive services in the most integrated setting when they transferred him to Dan Peterson, where he would have no interaction with his nondisabled peers, over the objections of the Kellers.

149.    Defendants repeatedly failed to provide C.K. with the most integrated services when they refused at least 4 distinct requests for C.K. to return to Foothill Elementary prior to June of 2018.

150.    When Defendants finally acquiesced and allowed C.K. to be transferred back to Foothill Elementary, they stated that such a transfer was always Mrs. Keller's right as a parent.

151.    Because Defendants did not allow C.K. to attend Foothill Elementary for a sustained period of time, C.K. received a segregated educational experience, and was placed in greater jeopardy of unreported abuse and neglect than his non-disabled peers.

### CLAIM FOUR: SEEKING EQUITABLE RELIEF – DENIAL OF PARTICIPATION IN EDUCATION SERVICES IN VIOLATION OF THE REHAB ACT
*~ Against Alpine School District, Alpine School District Board of Education, and Tarra Anderson in her Official Capacity ~*

152.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

153.    Under the Rehab Act, a recipient of Federal financial assistance must not deny a qualified

individual "the opportunity to participate in or benefit from the aid, benefit, or service" they provide. 34 C.F.R. § 104.4(b)(1)(i) (2012).

154. Defendants denied C.K. the opportunity to benefit from educational services and programs by repeatedly excluding him from the typical classroom environment while being restrained in a Rifton chair.

155. Defendants similarly denied C.K. the opportunity to participate in and benefit from educational services when they repeatedly and punitively secluded C.K. from the classroom in separate rooms, hallways, and other isolated places.

156. C.K. was placed in the Rifton chair multiple times a day, multiple days per week, from September 2017 to May of 2018.

157. This practice resulted in C.K losing countless hours of instruction and participation in educational services throughout the 2017-2018 school year.

## CLAIM FIVE: SEEKING EQUITABLE RELIEF – PROVIDING UNEQUAL AND LESS EFFECTIVE EDUCATIONAL SERVICES IN VIOLATION OF THE REHAB ACT
*~ Against Alpine School District, Alpine School District Board of Education, and Tarra Anderson in her Official Capacity ~*

158. Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

159. The Rehab Act prohibits a covered entity from providing aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others. *Id.* at §§ 104.4(b)(1)(ii)-(iii).

160. Because of his disability, and due to defendants' consistent failures to appropriately meet his needs, defendants' default approach has been C.K.'s removal and seclusion from his

classroom, where he is limited to receiving inherently unequal, inferior, and less effective educational services than those provided to other students without disabilities or the other disabled students in his class, which violates the Rehab Act and implementing regulations.

161.    Additionally, C.K.'s educational services were unequal to others because he was not permitted to attend a school with his nondisabled peers despite multiple requests from the Kellers.

162.    C.K.'s educational services were necessarily unequal to those provided to his nondisabled peers because he was repeatedly and routinely restrained for large swaths of time in a Rifton chair which is only used at schools for children with disabilities.

163.    C.K's educational services were unequal and less effective to those provided to his nondisabled peers because, in addition to being restrained, C.K. was also excluded from the educational environment resulting in a loss of instructional time and a loss of social interactions.

164.    C.K.'s educational services were unequal to those provided to his nondisabled peers because C.K. was repeatedly punished for exhibiting symptoms related to his disability including having food and water punitively withheld.

### CLAIM SIX: SEEKING LEGAL AND EQUITABLE RELIEF – UNLAWFUL SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION AS APPLIED TO THE STATES THROUGH THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)

*~ Against Alpine School District, Alpine School District Board of Education, Tarra Anderson in her Official and Individual Capacities, Jane Doe 1 in her Official and Individual Capacities, Jane Doe 2 in her Official and Individual Capacities, Jane Doe 3 in her Official and Individual Capacities, Jane Doe 4 in her Official and Individual Capacities, and Jane Doe 5 in her Official and Individual Capacities ~*

165.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs

and incorporates the same herein by reference, and further alleges as follows:

166. The Fourth Amendment of the United States Constitution provides that "the right of the people to be secure … against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. 4.

167. The United States Supreme Court has ruled that the protections against unreasonable searches and seizures applies to the states under the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).

168. C.K. has a Constitutional right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures.

169. C.K. has a constitutionally protected right to be secure in his person and to maintain his bodily integrity against unreasonable assaults of his person.

170. Defendants, Ms. Anderson and Jane Does 1-5, in physically seizing C.K., unlawfully subjected him to excessive, unreasonable, and unnecessary physical force and thereby caused serious and long-term harm.

171. The Defendants' repeated restraint of C.K. with unauthorized mechanisms, materials and/or procedures—which extended far beyond any tactic reasonably or justifiably related to legitimate behavioral corrections or safety interventions—constitute a violation of C.K.'s constitutional right against unreasonable seizure.

172. Defendants' routine physical restraint of C.K. in the Rifton chair and removal from the classroom was an unreasonable and unlawful seizure of C.K. by Defendants acting under color of law.

173. Defendants' physical restraint of C.K. using twine to bind his arms behind his back was an

unreasonable and unlawful seizure of C.K. by Defendants acting under color of law.

174. Defendants knew or should have known that ASD policies and state law forbade the use of mechanical restraint for instruction, behavior modification, or punishment. Defendants nonetheless continued these customs, policies, and practices.

175. Defendants knew or should have known that the use of restraints has been shown to be dehumanizing, humiliating, and physically dangerous.

176. Defendants' actions, as described above, were motivated by an intention to punish and harm C.K.

177. ASD has a policy, custom, or practice of failing to adequately train and supervise its faculty and staff in the use of mechanical restraints. This failure to train and supervise, and the resulting unreasonable seizures, violated C.K.'s constitutional rights.

178. ASD's policies, customs, or practices, as described herein, were the legal and proximate cause of C.K.'s injuries.

179. The acts or omissions of each Defendant caused C.K.'s damages in that he suffered physical and mental pain during the incident and continues to suffer from ongoing and continuous psychological injury, and will suffer from psychological injury in the future.

180. Defendants' actions, as described above were objectively unreasonable, willful and wanton, in light of the circumstances confronting Defendants.

181. The acts and/or omissions of Defendants were conducted within the scope of their official duties and employment and under color of law.

182. The actions of all Defendants, as described herein, intentionally deprived C.K. of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the

United States of America, and caused him other damages in an amount to be proven at trial.

183.    The conduct of the individual Defendants, described herein, violated the clearly established rights of C.K. of which reasonable people in Defendants' position knew or should have known.

### CLAIM SEVEN: SEEKING LEGAL AND EQUITABLE RELIEF – DENIAL OF THE CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS (42 U.S.C. § 1983)

*~ Against Alpine School District, Alpine School District Board of Education, Tarra Anderson in her Official and Individual Capacities, Jane Doe 1 in her Official and Individual Capacities, Jane Doe 2 in her Official and Individual Capacities, Jane Doe 3 in her Official and Individual Capacities, Jane Doe 4 in her Official and Individual Capacities, and Jane Doe 5 in her Official and Individual Capacities ~*

184.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

185.    By their actions, as described herein, Defendants, as part of a custom, policy, and/or practice subjected C.K. to the deprivation of his rights, privileges, or immunities secured by the U.S. Constitution and law. As a student in a public school, C.K. has a liberty interest in personal security and freedom from restraint and infliction of pain through a course of conduct that shocks the conscience.

186.    The practices described above include, but are not limited to, Defendants forcibly seizing C.K. as a student with disabilities, and restraining him with mechanical restraints without justification for extended periods of time in accordance with District custom, policy, and/or practice.

187.    Defendants knew or should have known that the custom, policy, and/or practice was not effective, in that C.K.'s behavior worsened as he spent more time in mechanical restraints.

188.    Defendants knew or reasonably should have known that repeated restraint in the Rifton

chair was causing physical and emotional harm to C.K. and that it could cause continued and lasting harm to C.K. in the future.

189.    Defendants knew or reasonably should have known that the practice of using twine to bind C.K.'s arms behind his back as a form of mechanical restraint was causing physical and emotional harm to C.K. and that it could cause continued and lasting harm to C.K. in the future.

190.    ASD knowingly permitted, authorized, and sanctioned continued harm to C.K.

191.    Defendants used mechanical restraints on C.K. to punish him for behavior stemming from his disability, such as throwing food, kicking, screaming, headbutting, or hitting. They also used mechanical restraints to punish C.K. for being disruptive, and as a routine practice when he exhibited no problem behavior at all.

192.    Defendants' actions and/or omissions, as described herein, were taken in accordance with ASD's custom, policy, and/or practice, or were ratified by ASD such that the District adopted such practices, customs, or policies.

193.    As a direct and proximate result of the actions described above, C.K. sustained actual damages, including emotional distress, fear, anxiety, and trauma; lost and diminished learning capacity; and expenses for past and future medical care, psychological care, and occupational and behavioral therapies, in an amount to be ascertained according to proof at trial.

194.    The acts and/or omissions of Defendants were conducted within the scope of their official duties and employment and under color of law.

195.    ASD knew or reasonably should have known about the abusive practices with respect to

C.K. and other students at Dan Peterson. The abusive and unconstitutional practices Defendants regularly undertook are so well settled as to constitute a custom or usage in the District. Nonetheless, ASD failed to take any affirmative actions to provide for the safety and wellbeing of the children with disabilities in Defendants' care, including C.K.

196.   Defendants' actions, as described above, were objectively unreasonable, willful and wanton, and shocking to the conscience in light of the facts and circumstances surrounding the repeated abuses inflicted on children with disabilities entrusted to Defendants' care, including C.K.

197.   The conduct of the individual Defendants described herein violated clearly established rights of C.K.'s of which reasonable people in the Defendants' position knew or should have known.

### CLAIM EIGHT: SEEKING LEGAL AND EQUITABLE RELIEF – DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS (42 U.S.C. § 1983)

*~ Against Alpine School District, Alpine School District Board of Education, Tarra Anderson in her Official and Individual Capacities, Jane Doe 1 in her Official and Individual Capacities, Jane Doe 2 in her Official and Individual Capacities, Jane Doe 3 in her Official and Individual Capacities, Jane Doe 4 in her Official and Individual Capacities, and Jane Doe 5 in her Official and Individual Capacities ~*

198.   Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

199.   C.K. has a procedural due process right to be free of deprivations of liberty and assaults on his bodily integrity without due process of law.

200.   This right requires ASD to provide process to C.K. before instituting a physically forceful policy and restraining C.K. using a Rifton chair and/or twine to bind his arms behind his back. The District's policy deprived C.K. of his right to be free from unlawful deprivations

of his liberty and bodily integrity without due process of law.

201.    It is clearly established that public school students, and particularly students with disabilities, have a constitutionally protected right to be free from punitive and malicious physical abuse from school employees. This abuse is an unlawful violation of C.K.'s constitutionally protected right to liberty.

202.    The use of mechanical restraint was a punitive action taken against C.K. in accordance with a District custom, policy, and/or practice that was contrary to clearly established law and regulations.

203.    ASD's custom, policy, and/or practice of regularly restraining students with disabilities, including C.K., using a Rifton chair, violated C.K.'s liberty interest.

204.    ASD's custom, policy, and/or practice of restraining students with disabilities, including C.K., using twine, violated C.K.'s liberty interest.

205.    C.K.'s parent and legal guardian never consented to the District's customs, policies, and/or practices. Defendants did not adequately explain or document their use of the Rifton chair or twine as a mechanical restraint. Instead, Defendants deliberately mislead and failed to disclose to the Kellers the regular and abusive use of mechanical restraints on C.K. This failure to provide notice or process was in violation of C.K.'s constitutional right to due process.

206.    Defendants were required to provide notice to the Kellers regarding the use of mechanical restraints and gain their informed consent. Furthermore, there can be no waiver of Constitutional rights. The only consent the Kellers could have given was the consent to use

restraint in the event of an emergency.

207.    ASD did not provide any process before violating the clearly established rights of C.K. to be free from abuse, deprivations of liberty, and violation of his bodily integrity.

208.    The District's policies, customs, and/or practices, as described herein, were the legal and proximate cause of C.K.'s injuries.

209.    The acts and/or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

210.    The acts and/or omissions of each Defendant caused C.K.'s damages in that he suffered physical and mental pain and continues to suffer from the resulting ongoing and continuous psychological injury.

211.    The actions of all Defendants, as described herein, intentionally deprived C.K. of the securities, rights, privileges, liberties, and immunities secured by the U.S. Constitution, and caused him other damages in an amount to be proven at trial.

### CLAIM NINE: SEEKING LEGAL AND EQUITABLE RELIEF – DENIAL OF EQUAL PROTECTION ON THE BASIS OF DISABILITY IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)

*~ Against Alpine School District, Alpine School District Board of Education, Tarra Anderson in her Official and Individual Capacities, Jane Doe 1 in her Official and Individual Capacities, Jane Doe 2 in her Official and Individual Capacities, Jane Doe 3 in her Official and Individual Capacities, Jane Doe 4 in her Official and Individual Capacities, and Jane Doe 5 in her Official and Individual Capacities ~*

212.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

213.    By their actions, as described herein, Defendants, under color of statute, ordinance,

regulation, custom, or usage, subjected C.K. to the deprivation of the rights, privileges, or immunities secured by the Constitution and law.

214.  Defendants discriminated against C.K., in whole or in part, because of his status as a child with a disability, denying him equal protection under the law as required under the Fourteenth Amendment to the U.S. Constitution.

215.  C.K. was mechanically restrained based, in part or in whole, on his disabilities or manifestations of his disabilities.

216.  Students without disabilities were not subjected to the abuses C.K. was subjected to, as described herein. This difference in treatment was due, in part or in whole, to C.K.'s status as a student with disabilities. Mechanical restraints, such as the Rifton chair and twine, were not used for behavior modification or punishment of students without disabilities. This abusive and illegal treatment was reserved solely for children with disabilities.

217.  ASD's decision to treat disabled students, including C.K., worse than the rest of the student population is unconstitutional.

218.  There is no rational basis for the District's custom, policy, and/or practice relating to mechanical restraint of children with disabilities, including C.K. This custom, policy, and/or practice shocks the conscience, and cannot be justified as relating to any rational basis.

219.  The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

220.  The actions of all Defendants, as described herein, intentionally deprived C.K. of the securities, rights, privileges, liberties, and immunities secured by the U.S. Constitution. As

a result of these deprivations, C.K. has suffered anxiety and other distress by being forced to endure repeated abuse at the hands of ASD faculty and staff tasked with providing C.K. with protection while at Dan Peterson.

221.    By virtue of their foregoing conduct, Defendants have violated 42 U.S.C. § 1983 and C.K. is entitled such relief as the Court finds to be appropriate, including, but not limited to, declaratory relief, injunctive relief, compensatory damages, punitive damages, and the costs and expenses of this action.

## CLAIM TEN: SEEKING LEGAL AND EQUITABLE RELIEF – NEGLIGENCE

*~ Against Alpine School District, Alpine School District Board of Education, Tarra Anderson in her Official and Individual Capacities, Jane Doe 1 in her Official and Individual Capacities, Jane Doe 2 in her Official and Individual Capacities, Jane Doe 3 in her Official and Individual Capacities, Jane Doe 4 in her Official and Individual Capacities, and Jane Doe 5 in her Official and Individual Capacities ~*

222.    Plaintiff, C.K., repeats and realleges each allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

223.    Defendants ASD and ASD Board of Education are liable for all injuries and damages proximately caused by the negligent acts and omissions of Ms. Anderson and Jane Does 1-5 during the course of their employment.

224.    Ms. Anderson and Jane Does 1-5 owed a duty of care to C.K. to (a) be knowledgeable about appropriate and approved forms of restraint and seclusion; (b) ensure that restraint and seclusion techniques were used only when necessary and only to the extent necessary; (c) ensure that no unauthorized or inappropriate forms of restraint and seclusion were used; and (d) ensure the safety and welfare of each student under their care.

225.    Ms. Anderson also owed a duty of care to C.K. to adequately supervise support staff in the

use of appropriate and approved restraint and seclusion.

226.    Ms. Anderson and Jane Does 1-5 failed to exercise reasonable care in fulfilling the duties described above when they: (a) began restraining C.K. in a Rifton chair in response to and as punishment for his behavior, when C.K. has no medical need for the mechanical physical support provided by a Rifton chair and Rifton chairs are universally rejected as a behavior modification tool or punitive restraint tool; (b) restrained C.K. by binding his hands behind his back with twine; (c) failed to abide by ASD discipline policy and Utah Admin. Code, which prohibit the use of mechanical restraint, with the exception of protective, stabilizing, or legally required mechanical restraints such as seatbelts during transportation, when they utilized the mechanical restraints of binding with twine and a Rifton chair that was not medically required; (d) continued to repeatedly restrain C.K. through the improper use of the Rifton chair for multiple hours per day, multiple days per week, from September 2017 to May 2018; (e) removed C.K. from the classroom when his classmates were engaged in group activities and lessons or during quiet time and placed him a dark room while strapped into a Rifton chair; and (f) withheld food and water from C.K. despite knowledge of and agreement to his Student Health Care Plan, which detailed C.K.'s need for a specialized diet due to seizures and frequent water to avoid dehydration due to his medications, as well as knowledge of requests from C.K.'s medical provider and Mrs. Keller regarding the necessity of frequent snacks due to medication that tended to increase C.K.'s hunger.

227.    Ms. Anderson further failed to exercise reasonable care in fulfilling the duties described above when she: (a) allowed support staff under her supervision to continually restrain C.K. in response to his "naughty" behavior through the use of a Rifton chair and through

the use of binding with twine, in violation of ASD discipline policy and Utah Admin. Code; and (b) instructed visiting BCaBAs that C.K. had to be put in the Rifton chair and that it needed to be buckled at all times.

228.   As a direct result of these negligent acts and omissions by Ms. Anderson and Jane Does 1-5, C.K. has suffered and continues to suffer injuries, damages, and losses, including, but not limited to: emotional distress, fear, anxiety, and trauma; lost and diminished learning capacity; and expenses for past and future medical care, psychological care, and occupational and behavioral therapies.

229.   But for the failure to exercise reasonable care in fulfilling these duties by Ms. Anderson and Jane Does 1-5, C.K. would not have suffered these injuries, damages, and losses. The breach of these duties by Ms. Anderson and Jane Does 1-5 was the cause in fact of C.K.'s injuries.

230.   These negligent acts and omissions directly resulted in C.K.'s injuries, damages, and losses. It was foreseeable that such acts and omissions on the part of Ms. Anderson and Jane Does 1-5 would result in harm to C.K., and C.K.'s injuries would not otherwise have occurred if Ms. Anderson and Jane Does 1-5 had not failed to exercise reasonable care in fulfilling their duties to C.K. The breach of these duties by Ms. Anderson and Jane Does 1-5 was the proximate cause of C.K.'s injuries.

231.   Having sustained injuries proximately caused by the foregoing conduct, acts, and omissions of Ms. Anderson and Jane Does 1-5 which comprise the tort of negligence as defined under Utah law, C.K. is entitled to such relief as the Court finds to be appropriate, including, but not limited to compensatory damages, punitive damages, and the costs and

expenses of this action.

## DECLARATORY RELIEF

232.   This action seeks declaratory relief pursuant to 28 U.S.C. § 2201 (2011) for the purpose of determining a question of actual controversy between plaintiff and defendants.

233.   Plaintiff, C.K., is entitled to a declaratory judgment concerning each of defendants' violations of the ADA and implementing regulations, as well as their violations of the Rehabilitation Act and implementing regulation and specifying C.K.'s rights with regard to defendants' services and facilities.

## INJUNCTIVE RELIEF

234.   This action seeks injunctive relief pursuant to 42 U.S.C. § 12188 and Rule 65 of the Federal Rules of Civil Procedure.

235.   Plaintiff, C.K., is entitled to a permanent injunction requiring that each and every defendant correct their respective violations of the ADA, Rehabilitation Act, and applicable implementing regulations as such relate to C.K., and requiring that each defendant also be enjoined from any further discriminatory exclusion of C.K. from their school system and services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff C.K. requests that the Court:

1.   Exercise jurisdiction over this action;

2.   Enter a declaratory judgment on behalf of C.K., declaring that all of the defendants' actions described herein are in violation of Title II of the ADA, Section 504 of the Rehabilitation Act, and their implementing regulations;

3.  Enter a declaratory judgment on behalf of C.K., declaring that the ASD defendants' actions are in violation of the Fourth Amendment proscription against unreasonable seizure; that such actions also deprived C.K. of his fundamental liberty interests in being free of bodily restraint and free from the wanton infliction of physical pain without due process of law, which constitute violations of the substantive liberty interests and procedural protections afforded him under the Due Process Clause of the Fourteenth Amendment; and finally, the entry of a declaratory judgment that the ASD defendants' policies violate C.K.'s right to Equal Protection of the laws, as provided by the Fourteenth Amendment to the U.S. Constitution and applied to the states by the same.

4.  Enter a declaratory judgment that the ASD defendants' actions are in violation of 42 U.S.C. § 1983 inasmuch as they violated C.K.'s rights under clearly established federal statutes and the Constitution of the United States, as described herein.

5.  Enter a permanent mandatory injunction ordering all defendants to cease their exclusion of C.K. from their public schools, and ordering defendants to grant C.K.'s requested modifications and effectively accommodate C.K.'s disability; ordering all defendants to cease their exclusion of C.K. from the equal participation and equal enjoyment of benefits of services and activities when the exclusion or denial occurs by reason of such disability; and an order directing all defendants to otherwise comply in all respects with their various obligations under the ADA, the Rehab Act, and the U.S. Constitution.

6.  An award of general and special damages against all ASD defendants, as to be determined by the Court, but at least nominal in amount; including an award of appropriate

punitive damages against ASD for the extraordinary, outrageous, egregious, and shocking conduct complained of herein; conduct which was encouraged and caused by ASD's intentionally discriminatory system of educating students with disabilities in inherently separate and unequal settings, and conduct which was the foreseeable and proximate result of ASD's deliberate indifference and complete dereliction of its duty to adequately train and supervise employees who serve students with disabilities, including C.K.

7.  Award to C.K. all costs and attorney's fees expended herein and assess all such costs against defendants;

8.  Grant C.K. such other and further relief as may be deemed just, equitable and appropriate by the Court.

RESPECTFULLY SUBMITTED THIS THE 8th DAY OF July, 2020.

DISABILITY LAW CENTER
Attorneys for Plaintiff

By */s/ Michelle Marquis*
AARON M. KINIKINI
LAURA HENRIE
MICHELLE MARQUIS

CERTIFICATE OF SERVICE

I, Jennifer Carver hereby certify that the foregoing FIRST AMENDED COMPLAINT is being

electronically filed using the CM/ECF system on this 8th day of July 2020, which will send

notices of such filing to all registered CM/ECF users.

KYLE J. KAISER (13924)
VANESSA R. WALSH (16180)
Assistants Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
E-mail: kkaiser@agutah.gov
        vwalsh@agutah.gov

                                    */s/ Jennifer Carver*
                                    Jennifer Carver